[ PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 01-17176

_____

District Court No. 98-00721-CR-JAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 9, 2005
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RUBEN CAMPA,
 a/k/a John Doe 3, etc.,
RENE GONZALEZ,
 a/k/a Iselin, etc.
GERARDO HERNANDEZ,
 a/k/a Giro, etc.
LUIS MEDINA,
 a/k/a Oso, etc.
ANTONIO GUERRERO,
 a/k/a Rolando Gonzalez-Diaz, etc.,

Defendants-Appellants.

_____

No. 03-11087

_____

District Court No. 98-00721-CR-JAL

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                              versus


GERARDO HERNANDEZ,
 a/k/a Giro, etc.,
LUIS MEDINA,
 a/k/a Oso, etc.,
RENE GONZALEZ,
 a/k/a Iselin, etc.,
ANTONIO GUERRERO,
 a/k/a Rolando Gonzalez-Diaz, etc.,
RUBEN CAMPA,
 a/k/a John Doe 3, etc.,


                                        Defendants-Appellants.


_____

Appeals from the United States District Court for the
Southern District of Florida
_____
(August 9, 2005)
Before BIRCH, KRAVITCH, and OAKES[*], Circuit Judges.

PER CURIAM:

The defendant-appellants, Ruben Campa, Rene Gonzalez, Gerardo

Hernandez, Luis Medina and Antonio Guerrero, were convicted and sentenced for

---

[*] The Honorable James L. Oakes, United States Circuit Judge for the Second Circuit, sitting by designation.

various offenses charging each of them with acting as unregistered Cuban intelligence agents working within the United States. Hernandez was also convicted of conspiracy to commit murder by supporting and implementing a plan to shoot down United States civilian aircraft outside of Cuban and United States airspace. They appeal their convictions, sentences, and the denial of their motion for new trial arguing, inter alia, that the pervasive community prejudice against Fidel Castro and the Cuban government and its agents and the publicity surrounding the trial and other community events combined to create a situation where they were unable to obtain a fair and impartial trial.[1] We agree, and REVERSE their convictions and REMAND for a retrial.

Our consideration of a motion for change of venue requires a review of the totality of the circumstances surrounding the trial. Therefore, in Part I, we consider the Background: the indictments, the motions for change of venue, voir dire, the

---

[1] The defendants raise numerous other issues unrelated to the change of venue. Campa, Gonzalez, Guerrero, Hernandez, and Medina argue prosecutorial misconduct regarding the misconduct of a government witness and during closing argument, improper use of the Classified Information Procedures Act, improper denial of a motion to suppress fruits of searches under the Foreign Intelligence Surveillance Act, Batson violations, insufficiency of the evidence regarding the conspiracy to transmit national defense information to Cuba, improper denial of a jury instruction regarding specific intent, and sentencing errors. Campa, Gonzalez, and Medina contend that the evidence was insufficient on the counts relating to violations of the Foreign Services Registration Act. Campa and Guerrero maintain that the district court improperly denied their jury instruction on necessity and justification. Hernandez raises the denial of a motion to dismiss Count III based on Foreign Sovereign Immunities Act jurisdictional grounds and insufficiency of the evidence for conspiracy to commit murder. Because we reverse their convictions based on the denial of their motions relating to change of venue, we do not address these additional issues.

court's interactions with the media, general facts regarding the trial, the evidence presented at trial, jury conduct and concerns during the trial, and the motions for new trial. Our review of the evidence at trial is more extensive than is typical for consideration of an appeal involving the denial of a motion for change of venue. This is so because the trial evidence itself created safety concerns for the jury which implicate venue considerations. In Part II, we discuss the law and our application of the law to the facts in this case. In Part III, we present our conclusion.

## I.  BACKGROUND

### A.  The Indictments

Campa, Gonzalez, Guerrero, Hernandez, and Medina were arrested on a criminal complaint on 12 September 1998, and were subsequently indicted with nine codefendants for conspiring to act as agents of the Republic of Cuba without registering with the Attorney General of the United States and to defraud the United States, in violation of 18 U.S.C. § 951(a)[2] and 28 C.F.R. §§ 73.01 et seq.,

---

[2]  Section 951 states:

> (a) Whoever, other than a diplomatic or consular officer or attache, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.
> (b) The Attorney General shall promulgate rules and regulations establishing requirements for notification.

18 U.S.C. § 951 (a) and (b).

In 28 C.F.R. §§ 73.1, the Attorney General set forth definitions for the terms used in the statute:

(a) The term agent means all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official, and who are not specifically excluded by the terms of the Act or the regulations thereunder.

(b) The term foreign government includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. Such term shall include any faction or body of insurgents within a country assuming to exercise governmental authority whether such faction or body of insurgents has or has not been regarded by the United States as a governing authority.

(c) The term prior notification means the notification letter, telex, or facsimile must be received by the addressee named in §§ 73.3 prior to commencing the services contemplated by the parties.

18 C.F.R. § 73.1(a)-(c).

Foreign agents are to provide notification to the Attorney General as follows:

(a) Notification shall be made by the agent in the form of a letter, telex, or facsimile addressed to the Attorney General, directed to the attention of the Registration Unit of the Criminal Division, except for those agents described in paragraph[] (b) . . . of this section. The document shall state that it is a notification under 18 U.S.C. 951, and provide the name or names of the agent making the notification, the firm name, if any, and the business address or addresses of the agent, the identity of the foreign government or official for whom the agent is acting, and a brief description of the activities to be conducted for the foreign government or official and the anticipated duration of the activities. Each notification shall contain a certification, pursuant to 28 U.S.C. 1746, that the notification is true and correct.

(b) Notification by agents engaged in law enforcement investigations or regulatory agency activity shall be in the form of a letter, telex, or facsimile addressed to the Attorney General, directed to the attention of Interpol-United States National Central Bureau. Notification by agents engaged in intelligence, counterintelligence, espionage, counterespionage or counterterrorism assignment or service shall be in the form of a letter, telex, or facsimile addressed to the Attorney General, directed to the attention of the nearest FBI Legal Attache. In case of exceptional circumstances, notification shall be provided contemporaneously or as soon as reasonably possible by the agent or the agent's supervisor. The letter, telex, or facsimile shall include the information set forth in paragraph (a) of this section.

. . .

(d) Any subsequent change in the information required by paragraph (a) of

5

and numerous overt acts, in violation of 18 U.S.C. § 371 (Count 1). They were alleged to have "function[ed] as covert spies . . . by gathering and transmitting information to Cuba[] concerning United States military installations, government functions, and private political activity; by infiltrating, informing on and manipulating anti-Castro political groups in Miami-Dade County [Florida]; by sowing disinformation" within these groups and in dealings with other private and public groups within the United States, "and by carrying out other operational directives of the Cuban government."[3] Guerrero, Hernandez, and Medina were also charged with conspiring to deliver to Cuba information "relating to the national defense of the United States,"[4] in violation of 18 U.S.C. §§ 794(a), (c), and 2

---

this section shall require a notification within 10 days of the change.

    (e) Notification under 18 U.S.C. 951 shall be effective only if it has been done in compliance with this section, or if the agent has filed a registration under the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. 611, et seq., which provides the information required by paragraphs (a) and (d) of this section.

28 C.F.R. § 73.3 (a), (b), (d), (e).

Under 18 U.S.C. § 371:

    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

[3] R1-224 at 3-4.

[4] Id. at 11.

(Count 2).[5] Gonzalez was charged with acting as an agent of the Republic of Cuba without prior notification to the Attorney General, and Hernandez and "John Doe 4 a/k/a Albert Manuel Ruiz" were charged with causing Gonzalez to act as an unregistered agent, in violation of 18 U.S.C. §§ 951 and 2 (Count 15).[6] Guerrero

---

[5] Id.. 18 U.S.C. § 794(a) provides that:

Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life, except that the sentence of death shall not be imposed unless the jury or, if there is no jury, the court, further finds that the offense resulted in the identification by a foreign power (as defined in section 101(a) of the Foreign Intelligence Surveillance Act of 1978) of an individual acting as an agent of the United States and consequently in the death of that individual, or directly concerned nuclear weaponry, military spacecraft or satellites, early warning systems, or other means of defense or retaliation against large-scale attack; war plans; communications intelligence or cryptographic information; or any other major weapons system or major element of defense strategy.

18 U.S.C. § 794(c) states:

If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.

Under 18 U.S.C. § 2:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[6] Id. at 23.

was charged with acting as an agent of the Republic of Cuba without notification to the Attorney General, and Hernandez, Medina, and Campa were charged with causing Guerrero to act as an unregistered agent, in violation of 18 U.S.C. §§ 951 and 2 (Count 16).

Hernandez was charged with conspiracy to murder, in violation of 18 U.S.C. §§ 1111 and 2, and overt acts related to that conspiracy, in violation of 18 U.S.C. §§ 1117 and 2 (Count 3),[7] possession of a counterfeit passport, in violation of 18

---

[7] 18 U.S.C. § 1111 states:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

Conspiracy to murder is addressed in 18 U.S.C. § 1117:

If two or more persons conspire to violate section 1111, 1114, 1116, or 1119 of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

U.S.C. §§ 1546(a) and 2 (Count 4),[8] possession of five or more fraudulent

[8] Fraud and misuse of passports and visas is governed by 18 U.S.C. § 1546:

(a) Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or

Whoever, except under direction of the Attorney General or the Commissioner of the Immigration and Naturalization Service, or other proper officer, knowingly possesses any blank permit, or engraves, sells, brings into the United States, or has in his control or possession any plate in the likeness of a plate designed for the printing of permits, or makes any print, photograph, or impression in the likeness of any immigrant or nonimmigrant visa, permit or other document required for entry into the United States, or has in his possession a distinctive paper which has been adopted by the Attorney General or the Commissioner of the Immigration and Naturalization Service for the printing of such visas, permits, or documents; or

Whoever, when applying for an immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or for admission to the United States personates another, or falsely appears in the name of a deceased individual, or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name without disclosing his true identity, or sells or otherwise disposes of, or offers to sell or otherwise dispose of, or utters, such visa, permit, or other document, to any person not authorized by law to receive such document; or

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact–

Shall be fined under this title or imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in

9

identification documents, in violation of 18 U.S.C. §§ 1028(a)(3) and 2 (Count 5),

possession of a fraudulent identification document, in violation of 18 U.S.C. §§

1546(a) and 2 (Count 6), acting as a foreign agent for the Republic of Cuba without

notification to the Attorney General (Count 13), and having caused Juan Pablo

Roque (Count 19), Alejandro Alonso (Count 22), Nilo Hernandez (Count 23), and

Linda Hernandez (Count 24) to have acted as unregistered foreign agents, in

violation of 18 U.S.C. §§ 951 and 2.

Campa was charged with possession of a counterfeit passport, in violation of

18 U.S.C. §§ 1546(a) and 2 (Count 7), possession of false identification

documents, in violation of 18 §§ U.S.C. 1028(a)(3), (b)(2)(B), and (c)(3), and 2

(Count 8)[9], and acting as an agent of the Republic of Cuba without prior

notification to the Attorney General, in violation of 18 U.S.C. §§ 951 and 2 (Count

---

section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facilitate such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense), or both.

[9] 18 U.S.C. § 1028(a)(3) provides:
Whoever, in a circumstance described in subsection (c) of this section–
. . . .
(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents
. . . .
shall be punished as provided in subsection (b) of this section.

17).

Medina was charged with possession of a counterfeit passport (Count 9) and possession of a passport obtained by use of a false statement (Count 11), in violation of 18 U.S.C. §§ 1546(a) and 2, making a false statement on his passport application, in violation of 18 U.S.C. §§ 1542 and 2 (Count 10), possession of fraudulent identification documents, in violation of 18 U.S.C. §§ 1028(a)(3), (b)(2)(B), and (c)(3), and 2 (Count 12), acting as an agent of the Republic of Cuba without notification to the Attorney General, in violation of 18 U.S.C. §§ 951 and 2 (Count 14), and having caused Joseph Santos (Count 25) and Amarylis Silverio Santos (Count 26) to have acted as unregistered agents.[10] A gag order was subsequently entered governing the parties and their attorneys.[11]

## B. Change of Venue

In August 1999, Medina's attorney moved to incur expenses under the Criminal Justice Act to poll the Miami-Dade County community to determine

---

[10] Codefendants Albert Manuel Ruiz (Count 18), Juan Pablo Roque (Count 19), John Doe No. 5 a/k/a Ricardo Villareal (Count 20), John Doe No. 6 a/k/a Remijio Luna (Count 21), Alejandro Alonso (Count 22), Nilo Hernandez (Count 23), and Linda Hernandez (Count 24) were also charged with having acted as unregistered agents, in violation of 18 U.S.C. §§ 951 and 2. Ruiz was also charged with causing Alonso (Count 22), Nilo Hernandez (Count 23), and Linda Hernandez (Count 24) to act as unregistered agents, in violation §§ 951 and 2. Roque remains unapprehended.

[11] R7-978 at 3; R21 at 117.

whether it was a fair and unbiased venue for the trial.[12]  Medina explained that the

traditional methodology for addressing pretrial publicity was not appropriate and

proposed that Florida International University Psychology Professor Gary Patrick

Moran conduct a telephone poll with a "sample of 300 people."[13]  The district court

granted the motion.[14]

In January 2000, Campa, Gonzalez, Guerrero, and Medina moved for a

change of venue, arguing that they were unable to obtain an impartial trial in

Miami as a result of pervasive prejudice against anyone associated with Castro's

Cuban government.[15]  The motions for change of venue were based on pretrial

publicity and "virulent anti-Castro sentiment" which had existed in Miami as "a

---

[12]  R1-280 at 2; R18 at 11-12.

[13]  R1-280 at 3.

[14]  R2-303.

[15]  R2-317 (Guerrero), 321 (Medina), 324 (Gonzalez), 329 (Campa); R3-397 (Campa).
Medina requested a change of venue "in light of evidence of pervasive community prejudice against
the accused" as documented by Professor Gary Moran's survey which showed "public sentiment
against persons alleged to be agents of Fidel Castro's Communist government in Cuba." R2-321 at
1-2. Moran concluded that, while there had been "several bursts of newspaper articles . . . and other
media attention" surrounding the Cuban spies' arrests, the basis for the motion was the "[v]irulent
anti-Castro sentiment" in the community. Id. at 3.
    Although Campa, Gonzalez, Guerrero, and Medina had originally argued that the case should
be moved to another judicial district, during oral argument on the motions, they agreed that they
would be satisfied with a transfer of the case within the district from the Miami division to the Fort
Lauderdale division. R5-586 at 2 n.1.

12

dominant value . . . for four decades."[16]  The motions were supported by news

articles and Moran's poll to substantiate "an atmosphere of great hostility towards

any person associated with the Castro regime" and "the extent and fervor of the

local sentiment against the Castro government and its suspected allies."[17]

The evidence submitted in support of the motions for change of venue was

massive.[18]  In 2000, a prominent Cuban-American attorney in Miami explained that

---

[16]  R2-321 at 3; R2-316 at 2; R2-317 at 2; R2-324 at 1; R2-329 at 1; R2-334 (containing news articles which detail the history of anti-Castro sentiment in Miami); R3-397 at 1; R3-453 at 1-2; R3-455 at 2; R3-461 at 2-3.

[17]  R2-329 at 1, 3; R2-334; R3-397; R3-455.

[18]  The following articles specifically addressing the conspiracy and the indicted defendants were attached as exhibits in support of the motions for change of venue:  George Gedda, Federal officials say 10 arrested, accused of spying for Cuba, MIAMI HERALD,  Sept. 14, 1998, R2-334, Ex.; Manny Garcia, Cynthia Corzo, Ivonne Perez, Spies among us: Suspects attempted to blend in, Miami, MIAMI HERALD, Sept. 15, 1998, at A1, R2-334; David Lyons, Carol Rosenberg, Spies among us:  U.S. cracks alleged Cuban ring, arrests 10,  MIAMI HERALD, Sept. 15, 1998, at A1, R2-329, Ex. A; R2-334, Ex.; Spies among us, MIAMI HERALD, Sept. 15, 1998, at 14A, R2-329, Ex. F; Fabiola Santiago, Big news saddens, angers exile community,  MIAMI HERALD, Sept. 15, 1998, R2-334, Ex.; Juan O. Tamayo, Arrest of spy suspects may be switch in tactics, MIAMI HERALD, Sept. 15, 1998, R2-334, Ex.; Javier Lyonnet, Olance Nogueras, Cae red de espionaje de Cuba/FBI viro´ al revés casa de supuesto cabecilla and Pablo Alfons, Rui Ferreira, Cae red de espionaje de Cuba/Arrestan a 10 en Miami, NUEVO HERALD,  Sept. 15, 1998, at A1, R2-329, Ex. B; La Habana Contra El Pentagono("Havana versus the Pentagon")/Estructura de la Red de Espionaje, NUEVO HERALD, Sept. 15, 1998, R2-329, Ex. C; Arrest of alleged Cuban spies demands vigorous prosecution, SUN-SENTINEL, Sept. 16, 1998, at 30A, R2-329, Ex. G; Juan O. Tamayo, Miscues blamed on military's takeover of Cuban spy agency, MIAMI HERALD, Sept. 17, 1998, at 13A, R2-334, Ex.; David Kidwell, Motion could delay trials of alleged 10 Cuban spies, MIAMI HERALD, Oct. 6, 1998, at B1, R2-334, Ex.; David Lyons, Cuban couple pleads guilty in spying case,  MIAMI HERALD, Oct. 8, 1998, at A1, R2-334, Ex.; David Kidwell, Three more accused spies agree to plead guilty, MIAMI HERALD, Oct. 9, 1998, at 4B, R2-329, Ex. H; R2-334, Ex.; Carol Rosenburg, Couple admits role in Cuban spy ring, MIAMI HERALD,  Oct. 22, 1998, at 5B, R2-329, Ex. H; Juan O. Tamayo, U.S.-Cuba spy agency contacts began a decade ago, MIAMI HERALD, Oct. 31, 1998, R2-334, Ex.; David Kidwell, U.S. tries to tie espionage case to planes' downing, MIAMI HERALD, Nov. 13, 1998, at A1, R2-334, Ex.; Carol

Cuban-related matters were "'hot-button issues'" as there were over 700,000

Cuban-Americans living in Miami.[19]  Of those Cuban-Americans, 500,000

remembered leaving their homeland, 10,000 had a relative murdered in Cuba,

50,000 had a relative tortured in Cuba, and thousands were former political

prisoners.[20]  Professor Moran's survey results showed that 69 percent of all

respondents and 74 percent of Hispanic respondents were prejudiced against

persons charged with engaging in the activities named in the indictment.[21]  A

significant number, 57 percent of the Hispanic respondents and 39.6 percent of all

---

Rosenberg,  Identities of 3 alleged spies still unknown, Nov. 14, 1998, at B1, R2-334, Ex.; Juan O. Tamayo, Spies Among Us/Castro Agents Keep Eye on Exiles, MIAMI HERALD, Apr. 11, 1999, R2-329, Ex. D; R2-334, Ex.; Carol Rosenberg, Shadowing of Cubans a classic spy tale, MIAMI HERALD, Apr. 16, 1999, at A1, R2-329, Ex. E; R2-334, Ex.; Cuban spy indictment/Charges filed in downing of exile fliers/The Brothers to the Rescue Shootdown:  David Lyons, Castro agent in Miami cited by U.S. grand jury, Juan O. Tamayo, Brothers to the Rescue Shootdown/Top spy planned Brothers ambush, and Elaine de Valle, Relatives: Charges fall short, MIAMI HERALD, May 8, 1999, R2-334, Ex.; Confessed Cuban spy receives seven years, MIAMI HERALD, Jan. 29, 2000, at B1, R2-355 at C-2; Contrite Cuban spy couple sentenced, MIAMI HERALD, Feb. 3, 2000, at B5, R3-355 at D-2; Miami Spy-Hunting, MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Ex. G-1; Carol Rosenberg, Confessed Cuban spies sentenced to seven years, MIAMI HERALD, Feb. 24, 2000, at 1B, R3-397, Ex. I-1; Terrorism must not win in Brothers to the Rescue shoot-down, MIAMI HERALD, Feb. 24, 2000, at 8B, R3-397, Ex. J-1 ("More than compensation, the families want the moral sting of a U.S. criminal prosecution in federal court.  So far there is only one indictment: Gerardo Hernandez, alleged Cuban spy-ring leader, charged last year with conspiracy to murder in connection to the shoot down."); Brothers Pilots Remembered (photo), MIAMI HERALD, Feb. 25, 2000, at B1, R3-397, Ex. K-1; Marika Lynch, Shot-down Brothers remembered, MIAMI HERALD, Feb. 25, 2000, at 2B, R3-397, Ex. L-1.

[19]  R15-1636, Ex. 9.

[20]  Id.

[21]  R2-321, Ex. A at 10.

respondents, indicated that, "[b]ecause of [their] feelings and opinions about Castro's government," they "would find it difficult to be a fair and impartial juror in a trial of alleged Cuban spies."[22]  Over one-third of the respondents, 35.6 percent, said that they would be worried about criticism by the community if they served on a jury that reached a not-guilty verdict in a Cuban spy case.[23]  The respondents who indicated an inability to be a fair and impartial juror were also asked whether there were any circumstances that would change their opinion.[24]  Of those respondents, 91.4 percent of the Hispanic respondents and 84.1 percent of all respondents answered "no."[25]  Many of the articles submitted by the defendants also documented the community tensions and protests related to general anti-Castro sentiment, the conditions in Cuba, and other ongoing legal cases, including the Elian Gonzalez matter.[26]

---

[22] Id. at Ex. A at 12; see id. at Ex. E at 3.

[23] Id. at Ex. A at 11-12.

[24] Id. at Ex. A at 13; id. at Ex. E at 3.

[25] Id. at Ex. A at 13.

[26] R3-397, Exs.; R4-483, Exs.; R4-498, Exs.
During the same period of time in which the motions for change of venue were pending, and ultimately the trial was conducted, there was a substantial amount of publicity regarding other matters of interest in the Cuban community including the conditions in Cuba and high profile legal events occurring in Miami:  the Elian Gonzalez matter; the arrest of an United States immigration agent, Mariano Faget, who was accused of spying for Cuba; and a city-county ban on doing business with Cuba.

15

As to the general anti-Castro sentiments and the conditions in Cuba:  Juan O. Tamayo, Former U.S. Pows Detail Torture by Cubans in Vietnam/Savage beatings bent captives to will of man dubbed 'Fidel', MIAMI HERALD, Aug. 22, 1999, at A1, R2-329, Ex. I; Juan O. Tamayo, Cuba toughens crackdown/'Biggest wave of repression so far this year', MIAMI HERALD,  Nov. 11, 1999, at A1, R2-329, Ex. K; Juan O. Tamayo, Witnesses link Castro, drugs, MIAMI HERALD, Jan. 4, 2000, at B3, R2-329, Ex. J; Marika Lynch, Castro-challenging pilot is offered parade, honors, Jan. 4, 2000, at B1, R2-329, Ex. M; Jim Morin, Cuba: I cannot speak my mind (cartoon), MIAMI HERALD, Jan. 20, 2000, R2-329, Ex. P.

As to Elian Gonzalez:  Juan O. Tamayo, Castro Ultimatum/Return boy in 72 hours or migration talks at risk, MIAMI HERALD, Dec. 6, 1999, at 1A, R2-329, Ex. N; Sara Olkon, Gail Epstein Nieves, Martin Merzer, The Saga of Elian Gonzalez/Protest and Passion Spread to the Streets/Sit-ins block intersections and disrupt Dade traffic and Politicians, lawyers work to halt 6-year-old's return, MIAMI HERALD, Jan. 7, 2000, 1A, I see no basis for reversing decision, Reno says and Sara Olkon, Anabelle de Gale, Marika Lynch, Pained Cuban exiles disagree on what's best for Elian, MIAMI HERALD, Jan. 7, 2000, at 17A, U.S. Preparations for boy's return start slowly, The Miami Herald, Jan. 7, 2000, at 18A, R2-329, Ex. O;  Peaceful Rally (photo), MIAMI HERALD, Jan. 9, 2000, at 1A, R2-329, Ex. N;  Jay Weaver, 3rd judge gets high profile in Elian case, MIAMI HERALD, Feb. 23, 2000, at 1B, R3-397, Ex. A-1; Sandra  Marquez Garcia, Mary 'appears' near Elian, MIAMI HERALD, Mar. 26, 2000, at 1B, R4-483, Ex. E-3; Alfonso Chardy, Authorities keep watch on exile groups, MIAMI HERALD, Mar. 29, 2000, at 10A, R4-483, Ex. C-3; Vigilant protestors, MIAMI HERALD, Mar. 29, 2000, at 10A, R4-483, Ex. I-3; Andres Viglucci, Jay Weaver, and Frank Davies, Dad gets visa, but no guarantees for Elian's transfer, MIAMI HERALD, Apr. 5, 2000, at 1A, R4-483, Ex. D-3; Elaine de Valle, Media watch events closely–and get watched in return/Hot words on radio scrutinized, and Terry Jackson, Media watch events closely–and get watched in return/TV talk, news shows flocking to South Florida, MIAMI HERALD, Apr. 5, 2000 at 15A, R4-483, Ex. B-3; Karen Branch, Crowds target Reno's home, MIAMI HERALD, Apr. 6, 2000, at 2B, R4-483, Ex. A-3; The saga of Elian/Reno wants Elian today/Boy must be at airport by 2 P.M./Defiant family refusing to comply:  Andres Viglucci, Jay Weaver, and Ana Acle, Great-uncle challenges U.S. to take boy 'by force', and Carol Rosenberg, The Attorney general followed 'instinct' as final mediator, MIAMI HERALD, Apr.13, 2000, at 1A, R4-483, Ex. F-3; The saga of Elian/Family defies order/Crowd swells at Little Havana home/Judge dismisses family's custody case/Panel will weigh request for a stay/U.S. takes no action to remove Elian: Ana Acle, In a show of solidarity, VIPs flock to visit boy, and Andres Viglucci and Jay Weaver, Reno: U.S. will explore all peaceful solutions, MIAMI HERALD, Apr. 14, 2000, at 1A, R4-483, Ex. G-3; Saga of Elian/Standoff over custody/A show of solidarity(photo), MIAMI HERALD, Apr, 14, 2000, at 20A, R4-483, Ex. H-3; Karl Ross, W. Dade home of attorney general on alert, and Police say an anonymous caller phoned in bomb threat April 13, MIAMI HERALD, Apr. 16, 2000, R4-498, Ex. A-4; Raid's Prelude: How talks failed/Missed signals helped doom deal and Sara Olkon, Diana Marrero, and Elaine de Valle, Thousands protest seizure/Separate rally backs Reno's actions, MIAMI HERALD, Apr. 30, 2000, at 1A, R4-498, Ex. C-4; Carol Rosenberg, INS agent targeted by death threats, MIAMI HERALD, May 6, 2000, R4-498, Ex. B-4; and In memory of mothers who died at sea (photo), MIAMI HERALD, R4-498, Ex. D-4;

One of the articles, which addressed a bomb threat against the Attorney General of the United States following a collapse of talks in the Elian Gonzalez case, recited a history of anti-Castro exile group violence in the Miami-Dade community:

> Scores of bomb threats and actual bombings have been attributed to anti-Castro exile groups dating back to the 1974 bombings of a Spanish-language publication, Replica. Two years later, radio journalist Emilio Millan's legs were blown off in a car bomb after he spoke out against exile violence.
> In the early 1980s, the Mexican and Venezuelan consular offices were bombed in retaliation for their government's establishing relations with Cuba.
> Since then, numerous small businesses–those promoting commerce,

---

As to Mariano Faget: Elaine de Valle, Fabiola Santiago, and Marika Lynch, <u>FBI: Official in INS spied for Cuba</u>, MIAMI HERALD, Feb. 18, 2000, at A1, R3-397 at C-1; Amy Driscoll, Juan Tamayo, <u>Spy bait taken instantly/Alleged Cuban agent phoned contact after receiving false FBI information</u>, Fabiola Santiago, <u>Aloof suspect with high clearance was ideally positioned to do harm</u>, and <u>Tracking Faget</u> (photos), MIAMI HERALD, Feb. 19, 2000, at A1, R3-397 at B-1; Don Bohning, <u>Faget's father was a brutal Batista official</u>, MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Ex. G-1; Frank Davies, <u>Cuba, U.S. still fight Cold War</u>, MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Ex. H-1; Juan O. Tamayo, <u>Cuban diplomat expelled over spy link</u>, MIAMI HERALD, Feb. 20, 2000, at A1, R3-397, at D-1; Liz Balmaseda, <u>Spy case boosts worst suspicions</u>, MIAMI HERALD, Feb. 21, 2000, at B1, R3-397, at F-1; Juan O. Tamayo, <u>Cuban diplomat linked to Elian, INS spy case</u>, MIAMI HERALD, Feb. 22, 2000, at A1, R3-397, at E-1; Juan O. Tamayo, <u>More exiles maneuvering for business with Cuba</u>, MIAMI HERALD, Mar. 5, 2000, at A-1, R3-455 at A-2; Ana Radelat and Jan O. Tamayo, <u>FBI agents expel defiant Cuban envoy</u>, MIAMI HERALD, at A-1, R3-455 at B-2.

As to the business ban: Marika Lynch, Fernando Almanzar, <u>Protest, taping set to follow Van Van show</u>, MIAMI HERALD, Sept. 28, 1999, at 3B, and Tyler Bridges, Andres Viglucci, <u>Miami may bar Van Van next time/County's Penelas also opposed</u>, MIAMI HERALD, Oct. 13, 1999, at B1, R2-329, Ex. L; Don Finefrock, <u>Ban on business with Cuba tightened</u>, MIAMI HERALD, Feb. 25, 2000, at 2A, R3-397, Ex. M-1; Jordan Levin, <u>Miami-Dade threatens to cancel film fest grant/Cuban movie collides with county law</u>, MIAMI HERALD, Feb. 25, 2000, at 1A, R3-397, Ex. N-1; Jordan Levin, <u>Groups 'warned' on Cuba resolution</u>, MIAMI HERALD, May 15, 2000, at 1B, R4-498, Ex. E-4; <u>Decenas De exiliados se congregaron ante la Corte Federal para reclamar el derecho de Elian Gonzalez a permanecer en EU</u>, R3-455, Ex. E-2.

17

travel, or humanitarian aid to Cuba–have been targeted by bombers.[27]

The government responded that the Miami-Dade Hispanic population was a "heterogeneous," "highly diverse, even contentious" "group" immune from the influences which would preclude a fair trial.[28]  Following oral arguments on 26 June 2000, the district court denied the motion without prejudice, finding that the defendants had failed to demonstrate that a change of venue was necessary to provide them with a fair trial by an impartial jury.[29]  The court "decline[d] to afford the survey and Professor Moran's conclusions the weight attributed by Defendants" finding, inter alia, that the "size of the statistical sample . . . [wa]s too small to be representative of the population of potential jurors in Miami-Dade County."[30]

In September 2000, Campa moved for reconsideration of the denial of the motion for change of venue.  In support of the reconsideration motion, he submitted news articles containing information that he provided the court both during an ex parte sidebar within the change of venue motion hearing and in his motion for leave to file his motions for foreign witness depositions ex parte.[31]  He

---

[27]  R4-498, Ex. A-4.

[28]  R3-443 at 11.

[29]  United States v. Hernandez, 106 F. Supp. 2d 1317 (S.D. Fla. 2000); R5-586.

[30]  Hernandez, 106 F. Supp. 2d at 1323-24.

[31]  R5-656 at 2-3.

18

explained in the reconsideration motion that the information had been previously provided to the court ex parte because it disclosed the defendants' theory of defense and that he sought the foreign witnesses to support that theory.[32] He argued that the news articles discussing "the defendants' tacit admission that they were keeping an eye on several extremist anti-Castro groups on behalf of the Cuban government, and that Cuban citizens and officials [we]re prepared to testify on behalf of the defendants" had aggravated the prejudice in the Miami community.[33] He noted that the articles characterized the defendants as Cuban agents who would call Cuban officials and citizens to testify on their behalf.[34] The district court denied reconsideration, stating that it had previously addressed the defendants' arguments.[35] It again explained that it could explore any potential bias during a voir dire examination and carefully instruct the jurors during the trial. Moreover, the district court noted that if it determined "that a fair and impartial

---

[32] Id. at 2.

[33] Id. at 3 (internal punctuation omitted).

[34] Id. The following articles were included as exhibits: Rui Ferreira, Cuba helps defense at spy trial, MIAMI HERALD, Aug. 18, 2000, at 1B, R5-656, Ex. A; Rui Ferreira, Funcionarios cubanos irán al juicio de los espías, NUEVO HERALD, Aug. 18, 2000, at 17A, R5-656, Ex. B; Cuba colaborará en juicio por espionaje, NUEVO DIARIO, Aug. 19, 2000, at 61, R5-656, Ex. C; Rui Ferreira, Un misterioso coronel cubano se suma al caso de los espías, NUEVO HERALD, Aug. 21, 2000, at 21A, R5-656, Ex. D; To the point/Mr. President, define "handshake", MIAMI HERALD, Sept. 11, 2000, at 6B, R5-656, Ex. F; and Accused spy seeks release of U.S. documents, MIAMI HERALD, Sept. 12, 2000, at 33, R5-656, Ex. E.

[35] R6-723 at 2.

19

jury cannot be empaneled, Defendants may renew this Motion and the Court shall consider a potential change of venue at that time."[36]

The trial began with jury selection on 27 November 2000.[37] During the trial, the motions for change of venue were renewed through motions for a mistrial based on community events and trial publicity and a government witness's insinuation that a defense attorney was a spy or a communist.[38] In February 2001, Campa moved for a mistrial and renewed his motion for a change of venue based on the activities during the weekend of 24 February 2001, including the "commemorative flights marking the fifth anniversary of the shoot down of the Brothers to the Rescue aircraft and the number of television interviews and the number of newspaper articles concerning that event."[39] He argued that the newspapers included "an editorial by the Miami Herald that flatly condemns the Cuban

---

[36] Id. at 2-3 (internal quotations omitted).

[37] R6-765.

[38] R70 at 7130-36; R81 at 8947-49. Although the district court did not overtly deny these motions, the motion based on community events and publicity was apparently resolved by "no response" to an inquiry to the jury as to whether they had "seen, heard, read, or [spoken to anyone] about any media accounts related" to the case following the trial's last recess. R70 at 7136. The motion based on the witness's insinuation was resolved by an instruction to the jury that the defense attorney's "job [wa]s to provide a vigorous defense for his client." R81 at 8955. "[The witness]'s statement regarding [the defense attorney] was inappropriate and unfounded." Id. at 8949.

[39] R70 at 7130. Brothers to the Rescue ["BTTR"] is "a Miami-based Cuban exile group", Hernandez, 106 F. Supp. 2d at 1318, founded by Jose Basulto in 1991 to rescue rafters fleeing Cuba in the Straits of Florida and to bring them to the United States. R80 at 8836-37.

20

government for this terrorist act" and articles including quotations from CANF members discussing "at length" the facts of the trial.[40] He maintained that "some news events are so great and are so explosive . . . that any amount of instructing the jury cannot cure the taint."[41] The court reserved ruling pending supplementation of the record and then asked whether an inquiry of the jury was requested.[42] Campa answered "[y]es" and, after the inquiry was discussed, the jury was subsequently questioned as to their exposure to the news articles.[43] When none of the jurors responded in any way, the case proceeded.[44]

Two weeks later, on 1 March 2001, Campa, Gonzalez, Hernandez and Medina filed a joint motion for a mistrial and change of venue arguing that the events during the weekend of 24 February "received a great deal of publicity, all of which was biased against the defendants and consistent with the government's position at trial."[45] They maintained that "[n]o amount of voir dire or instructions

---

[40] Id. at 7130-31.

[41] Id. at 7131.

[42] Id. at 7133.

[43] Id. at 7134-36.

[44] Id. at 7136.

[45] R8-1009 at 2.

to the jury c[ould] cure the taint, whose ripple effects are difficult to measure."[46]

They also requested a mistrial "so that their trial can be conducted in a venue where

community prejudices against the defendants are not so deeply embedded and

fanned by the local media."[47]  In May 2001, the district court denied the pending

motions for change of venue on the basis of its earlier orders denying a change of

venue and finding that

> the February 24th issues and events as well as the reporting of those
> events do not necessitate and did not necessitate a change of venue in
> this matter . . . .  The jurors were instructed each and every day . . . at
> each and every break and at the conclusion of the day . . . not to read
> or listen or see anything reflecting on this matter in any way and there
> has been no indication that the jurors did not comply with that
> directive by the Court.[48]

## C.  <u>Voir Dire</u>

The court held two status conferences to work out a two-phase plan for voir

dire.[49]  In phase one, 168 jurors were screened for problems such as language and

hardship through a written questionnaire and oral voir dire questions.[50]  In phase

two, the 82 remaining prospective jurors were individually questioned regarding

---

[46]  Id. at 5.

[47]  Id.

[48]  R120 at 13894-95.

[49]  1SR1 at 5; 1SR2.

[50]  R6-766; R22.

media exposure, knowledge and opinions of the case, the Castro government, the United States policy toward Cuba, the Elian Gonzalez case, the Cuban exile community and its reaction to the case, including a possible acquittal.[51]

On the first day of voir dire, the district court addressed isolating the jurors following their exposure to a press conference held by the victims' families on the courthouse steps and their approach by members of the press.[52] The trial judge instructed that she would no longer permit the victims' families to be present during voir dire "if there are efforts made to pollute the jury pool"[53] and instructed the government to speak to the victims' families regarding their conduct.[54] The court also noted that, because some of the potential jurors were approached by news media with cameras, she would question them regarding their discussions with the media and instruct the marshals to accompany the jury, with their juror

---

[51] The district court disqualified 79 of the 168 venire persons for cause, 32 (19%) in Phase 1 and 22 (27%) in Phase 2 for Cuba-related animus.

[52] R22 at 111-16; R62 at 6575-76.

[53] R22 at 113.

[54] R22 at 111-16. During the trial, Hernandez moved to enforce the gag order and alleged that two of the government witnesses had violated the order by holding a press conference with the family of one of the victims. R7-938. The district court issued a "narrowly tailored gag order" applicable to the "all [trial] participants, lawyers, witnesses, family members of the victims" clarifying that the order extended to "statements or information which is intended to influence public opinion or the jury regarding the merits of the case." R7-978 at 7; R64 at 6759-60.

23

tags removed, as they left the building.[55] The district court then extended the gag order to cover the witnesses and the jurors.[56]

Later that same day, a copy of the Miami Herald which contained an article about the case was found in the jury assembly room.[57] The next day, after Hernandez's attorney commented that the previous day's article was "disturbing," Guerrero's counsel mentioned that he had viewed one of the potential jurors reading the article while in the courtroom.[58] The district judge responded that "the issue is not whether [venire]persons have read or been exposed to publicity about the case of the defendants, but whether they have formed an opinion based upon what they have read. We will go into all of this as we go through individual voir dires."[59] As voir dire continued, a potential juror who evidenced substantial prejudice was isolated and removed from the venire so as to eliminate contact with other potential jurors.[60]

---

[55] R22 at 111-12.

[56] R7 at 978 at 2-3; R21 at 117-19; R22 at 119.

[57] R21 at 171.

[58] R23 at 195, 196-97. This juror was later stricken for cause as a result of his personal knowledge of Basulto. R24 at 537-40.

[59] R23 at 197.

[60] Id. at 300, 302-04, 307, 310.

During voir dire, the venire members were questioned about their political opinions and beliefs. Some venire members were clearly biased against Castro and the Cuban government. Peggy Beltran was excused for cause after stating that she would not believe any witness who admitted that he had been a Cuban spy.[61] When asked about the impact any verdict in the case might have, David Cuevas stated that he "would feel a little bit intimidated and maybe a little fearful for my own safety if I didn't come back with a verdict that was in agreement with what the Cuban community feels, how they think the verdict should be," and that, "based on my own contact with other Cubans and how they feel about issues dealing with Cuba–anything dealing with communism they are against," he would suspect that "they would have a strong opinion" on the trial.[62] He explained that he

> probably would have a great deal of difficulty dealing with listening to the testimony. I would probably be a nervous wreck, if you want to know the honest truth. I could try to be as objective as possible and be as open minded as possible, but I would have some trouble dealing with the case. I guess I would be a little bit nervous and have some fear, actually fear for my own safety if I didn't come back with a verdict that was in agreement with the Cuban community at large.[63]

James E. Howe, Jr. expressed concern that, "no matter what the decision in this

---

[61] R25 at 782, 789.

[62] R26 at 1068-69.

[63] Id. at 1070.

25

case, it is going to have a profound effect on lives both here and in Cuba."[64]  He

believed that the Cuban government was "a repressive regime that needs to be

overturned," was "very committed to the security of the United States," and "would

certainly have some doubt about how much control [a member of the Cuban

military] would have over what they would say [on the witness stand] without some

tremendous concern for their own welfare."[65]  Jess Lawhorn, Jr., a banker and

senior vice president in charge of housing loans, was "concern[ed] how . . . public

opinion might affect [his] ability to do his job" because he dealt with a lot of

developers in the Hispanic community and knew that the case was "high profile

enough that there may be strong opinions" which could "affect his ability to

generate loans."[66]  Potential juror Luis Mazza said that he did not like the Cuban

government and asked "how could you believe" the testimony of an individual

connected with the current Cuban government.[67]  Jenine Silverman believed that

"Fidel Castro is a dictator" and that there were "things going on in Cuba that the

people are not happy about."[68]  Jose Teijeiro thought that Castro had "messed up"

---

[64]  R27 at 1277.

[65]  Id. at 1278, 1274, 1273.

[66]  R26 at 1057, 1059, 1073.

[67]  R27 at 1166, 1168.

[68]  R28 at 1452-53.

Cuba which was "a very bad government . . . perhaps one of the worst governments that exist . . . on the planet."[69]

Other venire members indicated negative beliefs regarding Castro or the Cuban government but believed that they could set those beliefs aside to serve on the jury. Belkis Briceno-Simmons said she held a "[v]ery strong" opinion and did not believe in the Cuban system of government but did not feel that it would affect her ability to render a verdict.[70] Ileana Briganti thought she could be impartial, but admitted that "it would be difficult" and that she did not know if she "could be fair."[71] She said that the case was discussed "every time my [Cuban born] parents have visitors over" and that she knew she would be "a little biased" in favor of the United States as she did not agree with "communism."[72] David Buker stated that he believed that "Castro is a communist dictator and I am opposed to communism so I would like to see him gone and a democracy established in Cuba."[73] Haydee

---

[69] R26 at 1001-02.

[70] R25 at 880.

[71] Id. at 829-31, 834-39.

[72] Id. at 829, 831, 834.

[73] Id. at 743. Buker was subsequently seated on the jury and named as its foreperson. Although the government notes that Campa's attorney commented that Buker was "uninvolved or personally disconnected from the experience [of a Cuban]" and that his "general philosophical problem with communism" was "perfectly okay," Campa's attorney's comment was made in the context of his argument concerning striking for cause another juror whose responses were "rooted in personal experience." Id. at 851.

Duarte, who was born in Cuba and immigrated to the United States with her family in the late 1950s-early 1960s, had three relatives who were involved in the Bay of Pigs invasion and her husband had participated in the Mariel boat lift[74] to rescue his sister and her family from Cuba.[75] Although she stated that she would be impartial, she said that she saw "Castro as a dictator."[76] Maria Gonzalez, a Cuban immigrant, said that she did "not approve of the regime . . . in Cuba" and was "against communism" but believed she could serve impartially.[77] She remembered the news from the television and the Miami Herald about the planes being shot down.[78] Rosa Hernandez said that, although her father left Cuba because of communism and she believed that the Cuban government was "oppressive," she believed that she would not be prejudiced.[79] Sister Susan Kuk was the principal of the predominantly (90 percent) Cuban high school attended by the daughter of one

---

[74] The Mariel boatlift was a "freedom flotilla" in 1980 in which at least 114,900 Cuban political refugees left Cuba through the harbor of Mariel on boats for resettlement in the United States. See United States v. Frade, 709 F.2d 1387, 1389 (11th Cir. 1983).

[75] R27 at 1240-41.

[76] Id. at 1242-47.

[77] R25 at 790-96.

[78] Id. at 795.

[79] R27 at 1227-32.

of the killed BTTR pilots.[80]  She visited the pilot's home and attended his funeral.[81]

Despite her relationship with the pilot's daughter, Kuk thought she "could be fair" although "it would be a little difficult."[82]  Lilliam Lopez, was born in Cuba and immigrated to the United States with her family, stated that she was "always for the U.S." and "against the Republic of Cuba," did not like Cuba being a communist country, and had relatives living in Cuba.[83]  She had a problem with the case because it involved "espionage against the U.S." but indicated that she could set aside her feelings to serve on the jury.[84]  John McGlamery commented that he had "no prejudices" but "live[d] in a neighborhood where there [we]re a lot of Cubans" and was "acquainted with people that come from Cuba.  That is universal in Dade County."[85]  When asked whether he would be concerned about community sentiment if he were chosen as a juror, he "answer[ed] . . . with some care. . . . [i]f the case were to get a lot of publicity, it could become quite volatile and . . . people

---

[80]  R24 at 519-21.

[81]  Id. at 520-21.

[82]  Id. at 521-22.  The district court denied the defendants' request that Sister Kuk be excused for cause.  Id. at 534-36.

[83]  R27 at 1148-50.

[84]  Id. at 1149, 1151-58.

[85]  R26 at 1011, 1012.

in the community would probably have things to say about it."[86] He stated that "it would be difficult given the community in which we live" "to avoid hearing somebody express an opinion" on the case and to follow a court's instruction to not read, listen to, or otherwise expose himself to information about the case.[87] His opinion about the Cuban government was "not favorable" as it was "not a democracy" and was "guilty of assorted [human rights] crimes."[88] Hans Morgenstern initially said that he did not "think he would have any sort of prejudice[]" against defendants who were agents of the Cuban government but could not say for certain because of "[t]he environment that we are in. This being Miami. There is so much talk about Cuba here. So many strong opinions either way."[89] He later, however, admitted to having biases against the Cuban government, which he believed was "anti-American" and "tyrannical," and to having "an obvious mistrust . . . of those affiliated with the [Cuban] government."[90] He also indicated that he would be concerned about returning a not guilty verdict because "a lot of the people [in Miami] are so right wing fascist," because he would

---

[86] Id. at 1012

[87] Id. at 1018-19.

[88] Id. at 1013.

[89] Id. at 1021-22.

[90] Id. at 1023, 1027-28, 1032.

face "personal criticism" and media coverage, and because he had concerns for what might happen after a verdict was returned.[91] He believed the case to be "a high profile case" and that he had been videotaped by the media when leaving the courthouse.[92] Angel De La O, who was born in Cuba and immigrated to the United States with his parents, initially stated that he did not think he "could make a fair judgment" in the case and would be prejudiced because he had "a lot of family ties in Cuba" including uncles, aunts, and cousins but later answered that he could set aside his concerns if selected for the jury.[93] He was troubled about returning a verdict in the case based on his concern for something happening to his "family . . . in Cuba" and the notoriety of the case in Miami.[94] He also said that he had "heard a lot about the case . . . on the news [and from] people talking about" it.[95] Connie Palmer believed that Castro was "a very bad person" and, when asked whether her opinion regarding the Cuban government would affect her ability to fairly weigh the evidence, answered "I don't think so. . . . I don't know. I have lived in South

---

[91] Id. at 1024-27, 1030.

[92] Id. at 1026.

[93] R27 at 1139-41, 1143-48.

[94] Id. at 1142.

[95] Id. at 1140, 1146-47 (O remembered reading about the case but did not remember specific information).

31

Florida for 36 years and I have seen many changes."[96]  Palmer had known Sylvia

Iriondo, who had been a passenger in Basulto's airplane on the day of the shoot-

down and who was named as a government witness, for about eight years.[97]  She

also knew that Iriondo was "very involved with the Brothers to the Rescue and very

strongly keeping the Cuban community together in Miami."[98]  Joseph Paolercio did

not think that it would affect his ability to be impartial but he "was not happy" with

United States-Cuban relations following the Mariel boat lift.[99]  He did not like the

freedom that Cubans had to immigrate to the United States because immigrants

from other countries were treated differently and "sometimes [he felt like] a

stranger in [his] own country" when he needed to ask someone to speak English

instead of Spanish.[100]  Barbara Pareira had "many close Cuban friends," including

her husband's business partner who was a member of a group that rescued Cubans

fleeing the island.[101]  She believed that she could be impartial but had concerns

---

[96]  R28 at 1424-25.

[97]  Id. at 1433.

[98]  Id. at 1437.  The district court denied the defendants' request to strike Palmer for cause. R28 at 1442.

[99]  R25 at 818-22.

[100]  Id. at 820.

[101]  R27 at 1118-19, 1121-23, 1175-76.

32

about returning a verdict in Miami "because of the Cuban population here."[102]  She "was a little distressed with the way that the [Cuban] exile community handled" the Elian Gonzalez matter because she did not "like the crowd mentality, the mob mentality that interferes with what I feel is a working system."[103]  She strongly believed that the Cuban government was an oppressive dictatorship.[104]  Pareira remembered news reports regarding "the planes being shot down" and several men dying, and that it was a "very bad situation" and frightening because of the possibility of military action.[105]  Sonia Portalatin had a "strong" opinion about the Cuban government because she was "against communism."[106]  Leilani Triana testified that, although her parents were from Cuba and her grandfather had been politically involved in Cuba before Castro, she could be impartial.[107]  Eugene Yagle admitted having "a strong opinion" about the Cuban government as he could not "reconcile [him]self to that form of Government."[108]

---

[102]  Id. at 1119-28, 1177.

[103]  R27 at 1120, 1122.

[104]  Id. at 1120.

[105]  Id. at 1126, 1176-77.

[106]  R25 at 861.  Portalatin was subsequently seated as a juror.

[107]  R27 at 1249-50.

[108]  Id. at 1296-97.  Yagle was subsequently seated as a juror.

Finally, other venire members espoused indifference toward Castro or the Cuban government. John Gomez had traveled to Cuba with his family "to take goods" and medicines to friends and had friends who frequently traveled to Cuba; he knew of no reasons why he should not serve on the jury.[109] He remembered hearing or reading "years back" "something about Brothers to the Rescue" and someone in the group who was a spy for the Cuban government.[110] Luis Hernandez, who had family in Cuba, thought he could be fair, but was unable to say whether he would be able to believe a witness who was a member of the communist party in Cuba.[111] Miguel Hernandez's parents and grandparents had immigrated from Cuba and he had distant relatives who remained in Cuba but he had no opinions regarding the Cuban government, the trial, or the publicity surrounding it.[112] Florentina McCain felt sympathy for the people living in Cuba but believed that she would be impartial as a juror.[113] She knew from the media that "airplanes were shot down in Cuba a couple of years ago" and that "some families . . . gathered to remember the anniversary of the incident" a few weeks

---

[109] R25 at 841-43.

[110] Id. at 846.

[111] R27 at 1301-08.

[112] Id. at 1134-39.

[113] R26 at 990-96.

before voir dire.[114] Michelle Peterson also had concerns about community reaction to a verdict because she did not "want rioting and stuff to happen like what happened with the Elian case. I thought that got out of hand."[115]

After one potential juror was excused for cause because he had attended the funeral for a victim of the shoot-down, Hernandez moved to have another potential juror, Sister Kuk, excused for the same reason. The government opposed this request to strike,[116] maintaining that Sister Kuk attended the service as a professional, and that "[t]here were masses after the shoot-down all over town and numerous people attended."[117]

Many of the potential jurors who had personal contact with the victims, their family members, and BTTR were not questioned during Phase II or were excused for cause.[118] For example: potential juror Jessica de Arcos knew Rita and Jose Basulto;[119] potential juror Daniel Fernandez knew Jose Basulto;[120] potential juror

---

[114] Id. at 995.

[115] R26 at 938, 945.

[116] R24 at 534.

[117] Id. at 535.

[118] The victims' family members attended the trial, and were seated in a designated area in the courtroom. R25 at 717-18.

[119] R21 at 139; R23 at 251.

[120] R24 at 458, 508-10.

Tim Heatly knew Jose Basulto;[121] potential juror Sister Kuk knew government witness Marlene Alejandre, the widow of one of the killed BTTR pilots;[122] potential juror Caroline Rodriguez knew Marlene Diaz, the daughter of one of the BTTR victims.[123] The defendants also used a peremptory challenge to excuse Lazaro Barreiro, a former national bank examiner, who had assisted the United States Attorney's office in Miami for three years during a grand jury investigation.[124] Potential juror Placencia knew many of the named witnesses, and had helped raise money for BTTR while working for one of the local Cuban radio stations.[125] The district court granted the defendants additional peremptory challenges, for a total of 18, due to the "number of very close decisions made by the Court" on challenges for cause on jurors whose claims of impartiality were difficult to believe.[126] The defendants used 16 of their peremptory challenges to excuse jurors whose answers revealed biases against them.[127] The government exercised its peremptory

---

[121] R21 at 139; R23 at 254.

[122] R24 at 458.

[123] Id. at 373, 385-86.

[124] R25 at 655, 690, 709.

[125] Id. at 682-84.

[126] R27 at 1254, 1382.

[127] Id. at 1375-84; R28 at 1513; R29 at 1564; 1SR1 at 5-6, 11.

36

challenges as to the three prospective jurors who failed to express negative views toward Cuba.[128] Each of the Cuban-American prospective jurors was eliminated, despite the government's reverse Batson challenge.[129] Following voir dire, although complimenting the district court on the conduct of voir dire, Medina's attorney indicated his concern that there were three women seated on the jury who exemplified Professor Moran's opinion that certain community members who were subjected to community pressures were unable to admit their underlying prejudices.[130]

From the beginning of voir dire until the completion of the trial, the prospective and actual jurors[131] were admonished not to discuss the case with

---

[128] R25 at 776-70, 809-12; R26 at 937-41.

[129] R28 at 1508-11; see Baston v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986) (holding that the Equal Protection Clause guarantees that members of a defendant's race are not excluded from a defendant's jury on the basis of race).

[130] R27 at 1373-76.

[131] The selected jurors were Diana Barnes, R24 at 601-02; R25 at 800-05; Foreperson David Buker, R24 at 555, 561-62, 571, 590; R25 at 741-49; Richard Campbell, R22 at 60; R26 at 1032-39; Migdalia Cento, R22 at 69-70; R27 at 1128-33; R29 at 1556, 1559-62; Omaira Garcia, R25 at 659-61, 885-91; Sergio Herran, R22 at 147-52; R27 at 1219-25; Wilfred Loperena, R22 at 41-43, 88; R26 at 969-75; Juanito Millado, R22 at 15, 66; R27 at 1105-17; R28 at 1517-19; Gil Page, R25 at 556, 574, 583-87; R25 at 737-41; Elthea Peeples, R22 at 38-40; R26 at 956-62; Sonia Portalatin, R24 at 619; R25 at 858-65; and Deborah Vernon, R22 at 125, 142-43, 147, 153; R27 at 1233-39. Alternates were Marjorie Hahn, R22 at 131; R23 at 204-05, 250-51; R27 at 1342-50; Beverly Holland, R23 at 210-14, R27 at 1355; Miguel Torroba, R23 at 204; R27 at 1334-42; and Eugene Yagle, R22 at 144, 165-67; R27 at 1294-1300; R28 at 1517-20; R29 at 1553-57, 1601-02, 1638. Millado was excused due to family illness before the jurors were empaneled; Yagle was seated in his place. R29 at 1550-57, 1601-02, 1638.

anyone and to have no contact with media accounts or anything else related to the case.[132] The jurors were also instructed about the presumption of innocence.[133]

## D. The Media

Throughout the trial, the district court worked at controlling media access. During a discovery hearing, the district court reminded the parties and their attorneys that they were to refrain from releasing information or opinions which could interfere with a fair trial or prejudice the administration of justice.[134] The district judge stated that she was "increasingly concerned" that various persons connected with the case were not following her order based on the "parade of articles appearing in the media about this case."[135] In particular, she commented that an article about Medina's pending motion to incur expenses to poll the community "was the lead story in the local section on Saturday in the Miami Herald."[136] She warned all counsel and agents associated with the case that appropriate action would be taken and that the U.S. Attorney's Office would be

---

[132] R21 at 44-45; R22 at 119; R116 at 13492-93.

[133] R21 at 26.

[134] R18 at 14.

[135] Id.

[136] Id. at 15.

held responsible.[137]  She directed that "[t]his case . . . not . . . get advertised anywhere in the media for any reason whatsoever."[138]

As the case proceeded to trial, media attention expanded.  On the first day of voir dire, the district court observed that one of the victims' families conducted a press conference which was filmed outside of the courthouse during the lunch break and that some of the jurors were approached by the media.[139]  She then acknowledged that "[t]here is a tremendous amount of media attention for this case."[140]

The district court extended the sequestration order to cover the jury and witnesses to ensure that they had no contact with the media,[141] sealed voir dire questions during the jury selection,[142] and limited the sketching of witnesses for their protection.[143]  It permitted, however, the media "access to all the evidence

---

[137] Id. at 14-15.

[138] Id. at 17.

[139] R21 at 111, 117-19; R22 at 111-16.

[140] Id. at 115.

[141] R22 at 119.

[142] R24 at 625-26.

[143] R9-1126.

admitted into the trial record."[144]

## E.  **The Trial**

The case proceeded to a jury trial on 27 November 2000.  On 30 November, Hernandez's attorney raised the issue of the seating in the courtroom, specifically, the prejudice resulting from the assigned seating of the victims' families and the lack of seating available for the defendants' families.[145]  He argued that, as witnesses, the victims' families should not be seated behind the government.[146] The district court then reassigned the seating, so that the victims' families were seated in a row removed from the government and the defendants' families were given assigned seats.[147]

Defense witness Jose Basulto, a Cuban-American who had worked with the Central Intelligence Agency to infiltrate the Cuban government, testified that he was "dedicated to promot[ing] democracy in Cuba."[148]  When questioned about his activities during 1995, he responded by asking Hernandez's defense counsel

---

[144] Hernandez, 124 F. Supp. 2d at 704; R7-808.

[145] R25 at 712-13.

[146] Id. at 714.

[147] Id. at 717-18.

[148] R80 at 8822, 8825.

whether he was "doing the work" of the Cuban intelligence community.[149]  At the

request of Hernandez's attorney, the trial judge struck the comment and the jury

was instructed to disregard the comment.[150]  Following a recess, Campa's counsel

argued that Basulto's insinuation was

> precisely the kind[] of problem[] that we were afraid of when we filed
> our motions for a change of venue, and . . . in the aftermath of the
> events of February 24, 2001, we renewed our motion for . . . a change
> of venue based on the pretrial publicity, the publicity that has been
> generated during the course of the trial and our concern with our
> ability to obtain a fair trial in this community given that background.
>      This red baiting is absolutely intolerable, to accuse
> [Hernandez's attorney] because he is doing his job, of being a
> communist.  It is unfortunate, it is the type of red baiting we have seen
> in this community before and we are concerned how it affects the jury.
> Here we are asking the jury to make a decision based on the evidence
> and only based on testimony and we are left and they are left with
> wondering what will they be accused.  These jurors have to be
> concerned unless they convict these men of every count lodged against
> them, people like Mr. Basulto who hold positions of authority in this
> community, who have access to the media, are going to call them of
> being Castro sympathizers, accuse them of being Castro sympathizers,
> accuse them of being spies and this is not the kind of burden this jury
> can shoulder when it is asked to try and decide those issues based on
> the evidence at trial.
>      When someone can on the stand gratuitously and maliciously
> accuse [Hernandez's attorney] of being a spy[, it] sends a message to
> these ladies and gentlemen if they don't do what is correct, they will
> be accused of being communists too.  These people have to go back to
> their homes, their jobs, their community and you can't function in this
> town if you have been labeled a communist, specially by someone of

---

[149]  R81 at 8945.

[150]  Id.

Mr. Basulto's stature.[151]

He asked that the court consider this event and the other events in its consideration

of the pending motion for change of venue.[152]

## F. The Evidence at Trial

Campa, Gonzalez, Guerrero, Hernandez, and Medina, as well as others, were

members of a Cuban government intelligence operation identified as "La Red

Avispa," or the Wasp Network, which was charged with infiltrating, monitoring,

and disrupting the work of certain militant Cuban exiles in South Florida.[153]

Directorate Intelligence ("DI") Officers Hernandez, Medina, and Campa supervised

---

[151] Id. at 8947-49.

[152] Id. at 8949. In the alternative, counsel for Campa and Hernandez requested a jury instruction addressing Basulto's attack on Hernandez's counsel's credibility. R81 at 8949-53. The court found that the statements could affect "how the jurors view" Hernandez's counsel and instructed the jury that Hernandez's attorney's "job is to provide a vigorous defense for his client. Mr. Basulto's statement regarding [Hernandez's counsel] was inappropriate and unfounded." Id. at 8955.

[153] Govt. Exs. DAV 109 at 6-7; DG 101 at 2, 102 at 30, 117, 137 at 2. The Cuban government maintains the following intelligence operations: the Directorate of Military Intelligence ("DIM") under the Ministry of Revolutionary Armed Forces, and the Directorate of Intelligence ("DI") and the Directorate of Counterintelligence ("DCI") under the Ministry of the Interior. R44 at 3700-05, 3707. The DI collects intelligence outside of Cuba, focusing primarily on the United States; the DCI is responsible for intelligence regarding counter-revolutionary activities inside of Cuba. R44 at 3704, 3707. The DI is organized into many operational components, including M-I which handles non-military United States government agency intelligence, M-III which handles the collecting, correlating, and reporting of gathered information, M-V which handles the operation and support of "illegal" intelligence officers ("IO"s) who enter the United States illegally with a false identity and identification, M-XIX which handles counter-revolutionary individuals and organizations outside of Cuba. R44 at 3708-11, 3713; R46 at 3957.

agents, including agents Gonzalez and Guerrero.[154] The Wasp Network reported

information to Cuba on: (1) the activities of anti-Castro organizations in Miami-

Dade County;[155] (2) the operation of United States military installations including

those at Boca Chica Naval Air Station ("NAS"),[156] MacDill Air Force Base

("MacDill"), Barksdale Air Force Base ("Barksdale"), and the United States

Southern Command ("SouthCom");[157] and (3) United States political and law

enforcement activities.[158] The group was also charged with intimidating Cuban-

---

[154] Govt. Exs. DG 107 at 23; DAV 116 at 6. The IOs, as intelligence officers, were full-time employees of the DI who were trained in all aspects of intelligence work. R44 at 3719-20. Agents were individuals who worked as support for the IOs by providing information. The agents were paid for that information, but were not employees of the DI. R44 at 3720. The agents were supervised by other agents or legal or illegal officers. Id.

Guerrero functioned as both an IO and, in penetrating the Naval Air Station ("NAS") at Key West, Florida, as an agent. Govt. Ex. DAV 122 at 6, 10. While working at the NAS, he traveled at least twice to the DI headquarters in Cuba for training and debriefing on military matters. Govt. Exs. DG 108 at 31-33; DL 101 at 4; DL 103 at 13; DL 104 at 4; HF 136.

[155] R45 at 3870-71; Govt. Exs. DG 107 at 58-67, 129

[156] The NAS is the southernmost military base in the continental United States and is located about 90 miles from Cuba. R74 at 7910, 7920-21. It has an active airfield and several complexes of buildings used by the Air Force, Army, Coast Guard, Marines, and Navy. Id. at 7908-10. The public has access to the base roadways, but not to its buildings. Id. at 7912-13, 7915-17. The base is the primary United States military installation for conflicts in the Caribbean, and is used for national defense including intermediate and advanced combat air training and drug interdiction. Id. at 7910-11, 7920-22.

[157] Govt. Exs. HF 103; DG 107 at 12-20; DG 108 at 2-3. Southcom is one of the United States Department of Defense's five centralized geographic command centers for unified military operations within an area of responsibility ("AOR"). R46 at 4009-10. As of 1987, Southcom's AOR covered the Caribbean, including Cuba, and Latin America. Id. at 4012-14. Southcom's Miami headquarters is a secure, tightly-controlled facility housing "open storage" classified top secret, secret, and confidential materials. R46 at 4018-19.

[158] R103 at 11907-08, 11911-13.

American individuals and organizations with threatening letters and telephone calls;[159] penetrating United States Congressional election activities;[160] scouting and assessing potential sources of information and possible new recruits;[161] and carrying communications, cash, and other items between Miami and other United States-based DI officers and agents.[162] None of the Wasp Network members notified the United States Attorney General that they were acting as agents of the Cuban government.[163] Members of the Wasp Network and the DI frequently communicated and delivered items through the Cuban delegations' diplomatic cover.[164]

The Wasp Network members evaded detection through the use of false identities and code names, counter surveillance for contacts and communications, and DI decrypted written and broadcast communications.[165] Campa, Hernandez,

---

[159] R45 at 3793-99; Govt. Exs. DG 108 at 28-29; DG 127 at 7-8; DC 101 at 11-19; Dho 101 at 2-6.

[160] Govt. Ex. HF 143.

[161] Govt Exs. DG 141 at 6-7; DAV 118 at 14-19.

[162] Govt. Exs. 384, 865.

[163] R61 at 6404-15.

[164] R73 at 7821-46; R74 at 7871-78; Govt. Ex. HF-144.

[165] R40-3197; R43 at 3628-29; R44 at 3731-32, 3764-65; Govt. Exs. 1A; DAV 101 at 29; DAV 121; DG 118 at 2-3; HF 101-144.

and Medina falsely identified themselves through elaborate "legends," or biographies, which were supported by documents provided by the DI, and used these documents when they dealt with United States border and law enforcement personnel and when they obtained drivers licenses, passports, and other identification.[166] They also had back-up, or "reserve," false identities in which the agents used the names and other identification of United States citizens who had visited Cuba. The agents used these back-up identities when they traveled or if their primary "legend" was compromised.[167]

The Cuban exile groups of concern to the Cuban government included Alpha 66,[168] Brigade 2506, BTTR, Independent and Democratic Cuba ("CID"), Comandos

---

[166] R33 at 2145; Govt. Exs. 4; 5-1; 5-2; 5-3; 5-4; 8-1; 8-3; 8-4; 11; 12-3; 12-4; 12-5; 12-8; DAV 118 at 7-12; DG 105 at 2-16; DG 125; DG 135 at 3-11; DG 136. Under their false identities, Campa was also known as Fernando Gonzalez Llort, Oscar, or Vicky, R101 at 11714; Gonzalez was known as Agent Castor; Guerrero was known as Lorient, Govt. Exs. DAV 102 at 1; DAV 129 at 2; Hernandez was known as Girardo, Giro, or Manuel; and Medina was known as Allan or Ramon Labanino; R101 at 11721-23.

[167] R34 at 2321-40; R44 at 3724-26; R49 at 4677-78; R66 6833-35; R69 at 6981-7016; Govt. Exs. 5-6; 6; 7; 9; DAV 110 at 2; DAV 118 at 12-14; DG 126 at 9-10; SF 14; SF 15; SG 34; SG 53.

[168] Orlando Suarez Pineiro, a Cuban-born permanent resident of the United States, served as a captain in Alpha 66 for about six years. R90 at 10373-74. On 20 May 1993, he and other Alpha 66 members were arrested while on board a boat with weapons in the Florida Keys. Id. at 10391-92, 10397-401, 10415-16. The weapons included pistols with magazines and ammunition, 50 caliber machine guns with ammunition, rifles with clips, and an RK. Id. at 10397-400. Pineiro was tried and found not guilty of possession of a Norinko AK 47 rifle and two pipe bombs. Id. at 10424. Pineiro and other Alpha 66 members were also stopped and released while on board a boat on 10 June 1994, but their weapons and boat were seized. Id. at 10409, 10411-14. The seized weapons included a machine gun and AK 47s. Id. at 10411-14.

F4,[169] Commandos L, CANF,[170] the Cuban American Military Council

United States Customs Agent Ray Crump testified that, on 20 May 1993, he participated in the arrest of several men whose boat was moored at a marina in Marathon, Florida. Id. at 10429. The boat held: several handguns; automatic rifles, including one fully automatic rifle; four grenades; two pipe bombs; a 40 millimeter grenade launcher; a 50 caliber Baretta semiautomatic rifle; and a bottle printed with "Alpha 66" which contained "Hispanic propaganda . . . , . . . crayons, razors, stuff of that nature." Id. at 10431-33, 10434. He also participated in an investigation of a vessel south of Little Torch Key, about ten miles south of Marathon, Florida, on 11 July 1993. Id. at 10433-34. The vessel was carrying four men, numerous weapons, and "Alpha 66 type propaganda." Id. at 10434. The weapons on the vessel included an AR 15, two 7.6 millimeter rifles and ammunition magazines. Id. at 10438. Following this investigation, the men were not arrested, and the weapons and vessel were not seized. Id. at 10438-39.

United States Customs Agent Rocco Marco said that he encountered four anti-Castro militants on 27 October 1997, after their vessel, the "Esperanza", was stopped in waters off Puerto Rico. R90-10449. He explained that U.S. Coast Guard officers searched the vessel and found weapons and ammunition "hidden in a false compartment underneath the stairwell leading to the lower deck." The officers found food, water bottles, camouflage military apparel, night vision goggles, communications equipment, binoculars, two Biretta 50 caliber semiautomatic rifle with 70 rounds of ammunition, ten rounds of 357 hand gun ammunition, and magazines and clips for the firearms. R90 at 10453-59. The leader of the group, Angel Manuel Alfonso of Alpha 66, confessed to Rocco that they were on their way to assassinate Castro at ILA Marguarita, where he was scheduled to give a speech. Id. at 10452, 10467. Alfonso explained to Rocco that "his purpose in life was to kill [Castro]" and that it did not "matter if he went to jail or not. He would come back and accomplish the mission." Id. at 10468.

Debbie McMullen, the chief investigator with the Federal Public Defender's Office, testified that Ruben Dario Lopez-Castro was an individual associated with a number of anti-Castro organizations, including PUND and Alpha 66. R97 at 11267. Lopez and Orlando Bosch planned to ship weapons into Cuba for an assassination attempt on Castro. Id. at 11254. Bosch had a long history of terrorist acts against Cuba, and prosecutions and convictions for terrorist-related activities in the United States and in other countries. Campa Ex. R77 at 18-35.

[169] Rodolfo Frometa testified that, although he was born in Cuba, he was a citizen of the United States. R91 at 10531. He explained that he was a United States representative of a Cuban organization called Comandos F4, which was organized "to bring about political change in a peaceful way in Cuba" and included members both inside of and exiled from Cuban. Id. at 10532. He identified himself as the Commandate Jefe, or commander-in-chief, of F4 in the United States. Id. at 10534. He stated that, since 1994, all F4 members must sign a pledge that they will "respect the United States laws" and not violate either Florida or federal law. Id. at 10535.

Frometa stated that, before Comandos F4, he was involved with Alpha 66, another organization supporting political change in Cuba, from 1968 to 1994 and served as their commander "because of his firm and staunch position . . . against Castro." R91 at 10541-42. As a member of Alpha 66, Frometa was stopped by police officers and questioned regarding his possession of

46

weapons.  He was first stopped on 19 October 1993, while in a boat which had been towed to Marathon, Florida, and was questioned regarding the onboard weapons.  Id. at 10564-66.  The weapons included seven semi-automatic Chinese AK assault rifles and one Ruger semi-automatic mini 14 rifle caliber 223 with a scope.  Id. at 10564-66.  On 23 October 1993, he was again stopped while he and others were driving a truck which was pulling a boat toward the Florida Keys.  Id. at 10542-44.  Frometa explained that they were carrying weapons to conduct a military training exercise in order to prepare for political changes in Cuba or in the case of a Cuban attack on the United States, and once the officers determined that their activities were legal, they were sent on their way.  Id. at 10544-48, 10563.  The weapons were semi-automatic and included an R15, an AK 47, and a 50 caliber machine gun.  Id. at 10545-47.  Frometa and several other Alpha 66 members were once more stopped and released on 7 February 1994 for having weapons on board his boat.  Because a photograph of the group was "published in the newspapers" "[e]verybody in Miami" knew that they were released.  Id. at 10569.  On 2 June 1994, Frometa, by then a member of F4, was arrested after attempting to purchase C4 explosives and a "Stinger antiaircraft missile" in order to kill Castro and his close associates in Cuba.  Id. at 10571-72, 10574-76, 10579-80.  Frometa acknowledged that the use of the C4 explosive could have injured Cubans who worked at a military installation, id. at 10579, but that they had caused the "death of four U.S. citizens, the 41 people including 20 or 21 children who died; the mother of the child Elian, plus thousands and thousands who have died in the Straits of Florida."  Id. at 91-10581.

[170] Percy Francisco Alvarado Godoy and Juan Francisco Fernandez Gomez testified by deposition.  R95 at 11012; R99 at 11558-59.  Godoy, a Guatamalan citizen residing in Cuba, described attempts between 1993 and 1997 by affiliates of the CANF to recruit him to engage in violent activities against several Cuban targets.  2SR-708, Att. 2 at 10-13, 21-24, 27-28, 33-34, 44-46, 61, 63-64.  He said that, beginning in September 1994, he was asked to place a bomb at the Caberet Tropicana, a popular Havana nightclub and tourist attraction.  Id. at 44-46.  In connection with the same plot, he flew to Guatemala in November 1994 to obtain the explosives and detonators to be used and met with, among others, Luis Posada Carriles, a Cuban exile with a long history of violent acts against Cuba.  Id. at 49, 52, 56-58.  Unknown to the CANF members, Godoy was cooperating with the Cuban authorities, denounced their plans, and later testified at the trial of one of the conspirators in Cuba.  Id. at 22, 24, 26, 31, 58-59, 65, 70, 76, 81-82, 86, 90, 109.

Gomez, a citizen and resident of Cuba, described numerous attempts between 1993 and 1997 by persons associated with the CANF to recruit him to engage in violent activities against several Cuban targets.  Gomez also testified that, beginning in September 1994, he was asked to place a bomb at the Caberet Tropicana, a popular Havana nightclub and tourist attraction.  In 1996 and 1998, Gomez was approached by Borges Paz of the anti-Castro organization the Ex Club, 2SR-708, Att. 1 at 9, 12-14, 20, 39; Gomez said that Paz invited him to join their organization to build and place bombs at tourist hotels and at the Che Guevara Memorial in Santa Clara, Cuba.  Id. at 16, 19, 22.  After returning to Cuba, Gomez informed the Cuban authorities of the Ex Club's plans.  Id. at 20, 35-36.  As a result of his work for the United States government, Gomez said that he was estranged from his family in the United States, including a daughter in Florida, and had received threatening phone calls.  Id. at 64-66.

the National Democratic Unity Party (NDUP), and United Command for Liberation

(CLU).[171]  Alpha-66 ran a paramilitary camp training participants for an invasion of

Cuba, had been involved in terrorist attacks on Cuban hotels in 1992, 1994, and

1995, had attempted to smuggle hand grenades into Cuba in March 1993, and had

issued threats against Cuban tourists and installations in November 1993.  Alpha-

66 members were intercepted on their way to assassinate Castro in 1997.  Brigade

2506 ran a youth paramilitary camp.[172]  BTTR flew into Cuban air space from 1994

to 1996 to drop messages and leaflets promoting the overthrow of Castro's

government.  CID was suspected of involvement with an assassination attempt

against Castro.  Comandos F4 was involved in an assassination attempt against

Castro.  Commandos L claimed responsibility for a terrorist attack in 1992 at a

hotel in Havana.  CANF planned to bomb a nightclub in Cuba.  The Ex Club

planned to bomb tourist hotels and a memorial.  PUND planned to ship weapons

for an assassination attempt on Castro.  Following each attack, Cuba had advised

the United States of its investigations and had asked the United States' authorities

---

[171]  R83 at 9162, 9165-67; R90 at 10373-74, 10391-92, 10397-10401, 10409, 10411-14, 10415-16, 10429, 10431-34, 10449, 10452-59, 10467-68; R91 at 10541-42, 10544-48, 10563-66, 10571-72, 10574-76, 10579-80; R97 at 11267, 11291-97; 2SR-708, Att. 1 at 9, 12-14, 16, 19-20, 22, 35-36, 39; Att. 2 at 10-13, 21-24, 27-28, 33-34, 44-46, 61, 63-64; Campa Exs. R-29D, R-29F, R-29G, R-29H.

[172]  R97 at 11296-97.

to take action against the groups operating from inside the United States.[173]

The BTTR's flights over Cuba were of particular concern to the Cuban government. Sometime after 13 July 1995, the Federal Aviation Administration ("FAA") conveyed the Cuban government's threats to the BTTR that unauthorized planes flying into Cuban airspace would be forced to land or shot down.[174] On 9 and 13 January 1996, BTTR dropped thousands of leaflets into Cuba, which were printed with portions of the United Nations' Universal Declaration of Human Rights and which encouraged Cubans to fight for their rights.[175] In January 1996, BTTR President and Director Jose Basulto appeared on a United States-controlled Radio Marti program broadcast into Cuba claiming responsibility for dropping leaflets earlier that month and stating that BTTR advocated the use of civil disobedience.[176] The Cuban government protested to the United States about the airspace violations, complained that the measures used by the FAA to impede such flights were insufficient, and noted that unauthorized flights would be interrupted by force.[177]

---

[173] Campa Exs. R-29C; R-29F; R-29H; GH Exs. 16C, 24.

[174] R83 at 9166-67.

[175] R58 at 5919, 5922-23; Govt. Exs. HF 108 at G-3, 113 at G-3.

[176] GH Ex. 37 at 2-4, 6-8.

[177] GH Ex. 18E.

On 22 January 1996, the FAA's liaison to the State Department wrote the regional FAA office in Miami regarding these Cuban airspace violations. She stated that she had been advised of another unauthorized flight on 20 January, and that

> this latest overflight can only be seen as further taunting of the Cuban Government. State is increasingly concerned about Cuban reaction to these flagrant violations. They are also asking from the FAA what is this agency doing to prevent/deter these actions . . . [and] our case against Basulto. Worst case scenario is that one of these days the Cubans will shoot down one of these planes and the FAA better have all its ducks in a row.[178]

In early February 1996, a member of a delegation reviewing Cuban military activities was advised by the Cuban military that it was frustrated by the lack of a favorable response from the United States considering its repeated protests regarding the light civilian airplane flights from Florida which were violating Cuban airspace.[179] Thereafter, the delegation member met with officials from the United States Departments of Defense and State and advised them of what he perceived as a warning that Cuba was considering shooting down the flights.[180]

On 23 February 1996, the FAA issued a "Cuba Alert" to several United

---

[178] GH Ex. 18F.

[179] R76 at 8198-99, 8203-04.

[180] Id. at 8204-05.

States agencies.  In the alert, the FAA advised they had

> received a call from State Dept. indicating that since Brothers to the Rescue [BTTR] and its leader Basulto support and endorse the Concilio Cubano [an umbrella dissent organization] it would not be unlikely that the BT[T]R attempted an unauthorized flight into Cuban airspace tomorrow, in defiance of the GOC [Government of Cuba] and its policies against dissidents.  State Dept. cannot confirm this will happen and is in touch with local law enforcement agencies to better determine what's the situation.  I've reiterated to State that the FAA cannot PREVENT flights such as this potential one, but that we'll alert our folks in case it happens and we'll document it (as best we can) for compliance/enforcement purposes.
> State has also indicated that the GOC would be less likely to show restraint (in an unauthorized flight scenario) this time around . . . .[181]

On 24 February 1996, Basulto scheduled a flight into the Florida Straits, toward Cuba, in search of reported rafters.[182]  The flight plans were filed with the FAA and transmitted to Cuba.[183]  At approximately 1:15 P.M., three BTTR aircraft departed from the Opa-Locka, Florida, airfield:  N2506, carrying Basulto and others; N2456, piloted by Carlos Costa and carrying Pablo Morales; and N5485, piloted by Mario de la Pena and carrying Armando Alejandre.[184]  At approximately 3:00 P.M., the planes crossed the 24th parallel, which marks the boundary between the Miami and Havana Flight Information Regions and is in international airspace.

---

[181]  Def. Hernandez Ex. GH, composite 18G.

[182]  R83 at 9161-65, 9167-70.

[183]  Id.

[184]  Id. at 9168-70; Govt. Exs. 478, 479.

At this point, they communicated by radio with Havana Air Traffic Control ("Havana ATC") identifying themselves and their flights.[185] Within minutes of the crossing, Cuban military jet fighter aircraft sighted and pursued Costa's plane in international airspace.[186] At 3:20 P.M., Cuban military ground control radioed that the Cuban aircraft were "authorized to destroy." Id. Accordingly, the Cuban military aircraft fired on and destroyed the plane.[187] A few moments later, the Cuban fighter jet sighted the plane piloted by de la Pena and shot it down.[188] The shoot downs of the two BTTR planes were observed both by occupants of a fishing boat and by the crew and passengers onboard a cruise ship.[189] The bodies of the people in the aircraft, three of whom were United States citizens, were never recovered. Both planes were in international airspace, flying away from Cuba, when they were shot down; they had not entered Cuban airspace.[190]

---

[185] R83 at 9181-83; Govt. Ex. 475A at 2-3.

[186] Govt. Ex. 483 at 8-9.

[187] Id. at 10-11.

[188] Id. at 14-16.

[189] R53 at 5109-14, 5117-18; Govt. Ex. 483 at 5-7, 11, 13, 17-18, 20. The cruise ship was Royal Caribbean's "Majesty of the Seas" with about 2,600 passengers and 800 crew. R53 at 5084-86. The first officer on the ship explained that they were on the last leg of a weekly cruise about 24 nautical miles off the north coast of Cuba during the shootdowns. Id. at 5087-89, 5109-14. A videotape of the shootdowns made by a cruise ship passenger was apparently "played on TV many times." Id. at 5124.

[190] R53 at 5113-21, 5131-33; Govt Exs. 440, 469B, 484.

Lieutenant Colonel Roberto Hernandez Caballero, of the Ministry of Cuba Department of State Security, testified that he investigated a number of terrorist acts in Havana and in other locations at Cuban-owned facilities during 1997.[191] He advised Medina of the attacks in April and directed that he "[s]earch for active information on [the acts] that [the Cubans with ties to the Cuban American Military Council ("CAMCO")] have, or any attempt for future similar actions [in Cuba] by CAMCO."[192] In September, Hernandez notified the Cuban authorities that he had received information that "one of the two brothers who had something to do with the bomb on [an Italian tourist who was killed]" was available to meet for lunch and that "next week they [the terrorists] would try to place a bomb in one of the largest buildings [associated with tourism] in Cuba which is visited most by

---

[191] R93 at 10750-51, 10754-55, 10783-832. The acts included an explosion on 12 April 1997 which destroyed the bathroom and dance floor at the discotheque Ache in the Media Cohiba Hotel, id. at 10755, 10757, 10759; a bombing on 25 April 1997 at the Cubanacan offices in Mexico, R97 at 11318-19; the 30 April 1997 explosive device found on the 15th floor of the Cohiba Hotel, R93 at 10766-69, 10771; the 12 July 1997 explosions at the Hotel Nacional and Hotel Capri, both of which created "craters" in the hotel lobbies and did significant damage inside the hotels, id. at 10786-88, 10795-801; the 4 August 1997 explosion at the Cohiba Hotel which created a crater in the lobby and destroyed furniture; id. at 10802-05; explosions on 4 September 1997 at the Triton Hotel, the Copacabana Hotel, the Chateau Miramar Hotel, and the Bodequita del Medio Restaurant, id. at 10807-09, 10820; and, the discovery of explosive devices at the San Jose Marti International Airport in a tourist van in the taxi dispatch area on 19 October 1997 and underneath a kiosk on 30 October 1997, id. at 10824-30. The explosions on 4 September killed an Italian tourist at the Copacabana Hotel, injured people at the Chateau Miramar Hotel, the Copacabana Hotel, and at the Bodequita del Medio Restaurant, and caused property damage at all locations. Id. at 10809-13, 10815-20, 10822-23.

[192] R97 at 11316-18; Campa Exs. R57(a), R57(b) at 2, 59.

[Castro]."[193]  Hernandez's contact was instructed to elaborate on the information that he had obtained.[194]  As a result of the investigations, Caballero said that the Cuban Department of State Security arrested some individuals, but that he believed some of the individuals responsible for financing, planning, and organizing the explosions lived in the United States and had not been arrested.[195]  Caballero explained that, in June 1998, he provided FBI agents with documentation and investigation materials regarding the terrorist acts between 1990 and 1998, and received the FBI's findings in March 1999.[196]

Hernandez worked in the United States from 1994 to 1998, supervising unregistered Cuban agents Juan Roque and Rene Gonzalez who both infiltrated the BTTR organization, and Operation Aeropuerto which was Guerrero's penetration of the NAS.  In late 1995 and early 1996, Hernandez participated in a plan to have Roque return to Cuba to undermine the BTTR.  He also directed an agent to apply for a job with Southcom,[197] and later supervised Operation Suroc which was the

---

[193]  R97 at 11320-21.

[194]  Id. at 11321; Campa Ex. R63 at 1.

[195]  R93 at 10832, 10839, 10842.

[196]  Id. at 10839-41; Campa Ex. R-33-MM.

[197]  R40 at 3231-32, 3238-40; R46 at 4012-14; Govt. Exs. DG 103 at 3-4, HF 104 at G-3.

agents' penetration of Southcom.[198]  In late January 1996, he received a series of

messages from the Cuban government announcing "Operacion Escorpion," which

involved confronting the counter-revolutionary efforts of the BTTR in late January

1996.[199]  In the messages, Roque and Gonzalez were directed to provide Cuba with

specific information through codes regarding the BTTR flying missions; Roque

and Gonzalez were advised not to fly on these missions.[200]  Hernandez was later

recognized for his "decisive" role in Operations Venicia and German, in which "the

Miami right [was dealt] a hard blow."[201]

　　　Hernandez also participated in the spread of disinformation.  He was asked

to mail DI-furnished letters, purporting to be from a "counterrevolutionary"

organization which threatened members of Congress who supported lifting the

embargo on Cuba in order to provoke the defeat of members of Cuban-American

descent.[202]  Hernandez suggested a number of projects in south Florida:  making

threatening phone calls to a newspaper publisher which appeared to come from a

---

[198] Govt. Exs. DG 107 at 23-24, DG 108 at 2.

[199] Govt. Ex. HF 115 at G-3.

[200] Id.; Govt. Exs. 112 at 10;  DG 104 at 2;  HF 116 at G-3; HF 120 at G-3, 121 at G-3; HF 122 at G-3; HF 123 at G-3.

[201] Govt. Exs. HF 128-G03; DG 108 at 6, 8; HF 136-G-3.  Operations Venicia and German involved Roque's extraction from the United States and return to Cuba to denounce BTTR.

[202] R49 at 4611-12; DG 102 at 42.

CANF supporter; testing BTTR's airplane security for sabotage feasibility; and publishing a book suggesting that BTTR founder Basulto knew in advance that his BTTR followers would be shot down over Cuba.[203] He asked Gonzalez to provide information to M-III[204] about funding for anti-Castro sabotage, disagreements in the Miami-Cuban community about the Pope's visit to Cuba, and disagreements within CANF over its internal leadership succession and future terrorist plans.[205] In August 1998, Hernandez reported to the Cuban government on information that he had learned from a newspaper article that Alpha 66 camp participants, armed with rifles and semiautomatic machine guns, simulated an attack on a Cuban air base, and that an identified individual had claimed to have participated in Cuban hotel bombings in 1992, 1994, and 1995.[206] He also shared the news from the article that Alpha 66 continued to prepare for attacks against Cuba, that some of the group's arsenal was located on an island behind Andrews Air Force Base, and that the group was attempting to obtain C-4 explosives to use during its next attack.[207]

Medina worked with Guerrero and assumed his supervision from Hernandez

---

[203] R49 at 4614-16; Govt. Exs. DG 107 at 52; DG 127 at 5; DG 139 at 10-11.

[204] See supra note 137.

[205] Govt Ex. DC 101 at 19-21.

[206] R97 at 11291-93, 11295.

[207] Id. at 11294.

in June 1997.[208]  He also supervised Operation Suroc and worked with agents who

had been recruited by Hernandez to penetrate Southcom.[209]  In May 1997, Medina

was asked by the DI to gather information regarding infiltrating various local, state,

and federal agencies located in Florida, including military bases, the Coast Guard,

the Immigration and Naturalization Service ("INS"), and the Federal Bureau of

Investigation ("FBI").[210]

At some point, Campa took over supervision of several operations from

Hernandez and Medina, including Operation Aeropuerto and Operation Suroc.[211]

Campa admitted that he and several of his codefendants worked secretly on behalf

of the Cuban government to gather and relay information concerning the activities

of numerous local, extremist anti-Castro groups and individuals who had

previously conducted terrorist acts against Cuba.[212]  He was also directed to work

on a number of operations, including Operation Rainbow/Arcoiris, Operation

Brown/Morena, Operation Fog/Neblina, Operation Paradise/Paraiso, Operation

---

[208]  Ex. R52 at 4; Govt. Exs. DAV 123 at 47, 49; DG 109 at 17; DG 110 at 1.

[209]  R40 at 3231-32, 3238-40; R41 at 3317; R46 at 4012-14; Govt Exs. DG 108; DS 103 at 2, 4, 11; DG 110.

[210]  Govt. Ex. DAV 113 at 1, 3-4.

[211]  R49 at 4618-19; R31 at 3; R43 at 3; R51 at 9;  R52 at 5-10; R84 at 20-27; R97 at 11242, 11252-53, 11277, 11279; Campa Exs. R22 at 26; R24 at 65, 74; Govt. Exs. DAV 118 at 1-5; DG 108 at 28-29; DG 127 at 7-8; HF 143.

[212]  R91 at 10592-93.

Giron, and others. Operation Rainbow involved filming a meeting between CANF leader Orlando Bosch, Alpha 66 and PUND leader Ruben Dario Lopez and a Cuban agent to plan a shipment of weapons into Cuba for the proposed assassination of Castro; other participants included Campa, Hernandez, and two other Cuban agents.[213] Operation Brown required Campa to keep an eye on Bosch in order to learn his relationships and movements, and the places he frequented.[214] Operation Fog involved Campa and Medina monitoring the activities of Roberto Martin Perez, a member of the board of directions for the CANF, which the Cuban government believed was responsible for two July 1997 hotel bombings.[215] In Operation Paradise, Campa and others, including Rene Gonzalez and other Cuban agents, gathered information on the paramilitary activities of Cuban exile groups operating in the Bahamas, including CANF, Alpha 66, Cuba 21, BTTR, and individuals in those organizations.[216] Operation Giron was an attempt to infiltrate CANF, which involved Medina and later Campa as a temporary replacement for Medina.[217] Some of the unnamed operations included identifying and videotaping

---

[213] R97 at 11253-55; Campa Ex. R24 at 8-9.

[214] R97 at 11268-69; Campa Exs. R22 at 26, R24 at 15-16, 19.

[215] Id. at 11263, 11270-71, 11273.

[216] Id. at 11274-77; Campa Ex. R24 at 21.

[217] R97 at 11277; Campa Exs. R19 at 11-13, 20-23, R20 at 2-4, R35 at 16, 20.

boats in the Miami River, obtaining information concerning Cuban exile paramilitary camps, and surveillance of various anti-Castro persons and groups. In July 1998, Campa and Hernandez, working with other Cuban agents, identified and videotaped two boats in the Miami River which were believed to contain weapons and explosives destined for Cuba.[218] The agents were instructed to consider disabling the boats by burning or damaging them or anonymously notifying the FBI about the boats.[219] Campa and Hernandez also unsuccessfully tried to locate the Comandos L camp F-4, near Clewiston, Florida, with directions provided to them by the Cuban government.[220]

The agents supervised by Campa and Medina operated with a separate small budget requiring approval by the authorities in Cuba, and the officers shared housing to economize.[221] Campa lived in an apartment owned by Hernandez from November 1997 until February 1998, and in an apartment shared with Medina from July until September 1998.[222]

---

[218] R97 at 11284-86, 11289.

[219] Id. at 11285, 11288-89.

[220] Id. at 11290-91.

[221] Campa Ex. R32 at 2-3; Govt. Exs. DAV 102 at 1; 109 at 1-2, 5-6; 116 at 3, 7; 118 at 2; 124 at 8; 126 at 21; 129 at 3, 59.

[222] R97 at 11277-78; R101 at 11714, 11721-23.

Guerrero was listed as a part of a different operative base which carried out M-V[223] missions, including those targeting United States military installations.[224] Under Operation Aeropuerto, Guerrero achieved "long-term" penetration of the NAS through his employment in the Public Works Department in 1993. He was employed in maintaining the sewage lift-off stations and had access to many areas of the NAS.[225] Although he executed several United States loyalty affidavits as conditions of that employment, he was also fulfilling a DI work plan to obtain military information, to conduct visual intelligence of the NAS, and to search for operational resources.[226]

Guerrero delivered frequent detailed reports to Campa, Hernandez, and Medina regarding the deployment of United States military assets at the NAS from 1994 through 1997.[227]

Gonzalez worked in a number of operations and "active measures." He was furnished with proposed text for anonymous letters and telephone calls by Hernandez and was directed to consider ways to harass and cause dissension

---

[223] See supra note 137.

[224] Govt. Exs. DAV 102 at 1; 129 at 62.

[225] R74 at 7918; Govt. Ex. DG 120 at 2-3.

[226] R74 at 7959; Govt. Ex. 122 at 5-8, 10.

[227] Govt. Exs. DAV 101 at 9-28; DAV 102 at 17-29; DG 121; DL 102 at 11; DG 141 at 19.

among the counter-revolutionary organizations by disseminating rumors that Basulto was disparaging various members.[228] Gonzalez was directed to study BTTR's airplane hangar, to consider burning down its warehouse and spreading rumors that BTTR had burned the warehouse for insurance money, to disable BTTR equipment and antennae, and to threaten a United States government agent with execution and send him a book bomb-appearing device.[229]

Gonzalez was also instructed to act as an FBI informant.[230] Shortly after the BTTR shootdown, Gonzalez told his FBI contact that he felt betrayed by Roque.[231] After the disks found in the Avispa officers' apartments were decrypted, the FBI again approached Gonzalez based on his BTTR association; Hernandez warned Gonzalez to act torn between his opposition to terrorism and his loyalty to the anti-Castro "brothers" and not to act like a "Castro agent."[232] Gonzalez reported that he had told the FBI that ethically he could not inform on the BTTR, but assured the FBI that he would contact its agents if he learned of anything that would affect

---

[228] R49 at 4583-91, 4598-604, 4612-13; R60 at 6277-83; Govt. Ex. DC 101 at 11-19, 701, 701A, 702.

[229] Govt. Ex. DHo101 at 2-6.

[230] Govt. Exs. HF 105 at G-3, 125 at G-3.

[231] R69 at 7044, 7077-78.

[232] Govt. Ex. DG-107 at 58-60.

United States security.[233]

During the trial, the government described the Cuban intelligence operations as "an intelligence pyramid" headed by Fidel Castro.[234] It suggested that the Cuban government applied the "penalty" of death for throwing things out of airplane windows,[235] and was "repressive"[236] and a "dictatorship".[237]

## G. Closing Arguments

During closing arguments, the government commented that Hernandez's attorney had called the shootdown "the final solution" and noted that such terminology had been "heard . . . before in the history of mankind."[238] It argued that the defendants had voluntarily joined "a hostile intelligence bureau" that saw

---

[233] Id. at 65-67.

[234] R44 at 3699-700. The U.S. Attorney asked government witness Stuart Hoyt to describe the structure of the Cuban intelligence system by questioning "who is at the top of the Cuban intelligence system." R44 at 3699. Hoyt responded by stating that "Fidel Castro" was at the top as "Commander-in-Chief", "[P]resident", "Council Minister", and "head of the Cuban Communist Party." Id.

[235] R73 at 7806-07.

[236] R80 at 8748. After a defense witness explained on cross-examination that the tone of the dissenters within Cuba was "more respectful" than that of Cuban exile organizations located outside of Cuba, the government attorney asked whether such an answer was relevant when it was a "[p]articularly repressive government." R80 at 8748. Late, after the witness stated that, if he had been a dictator, he would have tried to stop the BTTR flight, the government attorney questioned whether "[w]e live in a dictatorship." Id. at 8754. After the witness replied "Fortunately we don't," the government attorney commented, "And people do have that freedom of choice." Id.

[237] Id. at 8754.

[238] R124 at 14474.

"the United States as its prime and main enemy."[239]  It stated that "the Cuban government" had a "huge" stake in the outcome of the case, and that the jurors would be abandoning their community unless they convicted the "Cuban sp[ies] sent to . . . destroy the United States."[240]  It maintained that the Cuban government sponsored "book bombs," "telephone threats of car bombs," and "sabotage," and "killed four innocent people."[241]  It suggested that the Cuban government used "goon squads" to torture its critics.[242]  It asserted that the Cuban government had their agents falsify their identities by using the identification of "dead babies" and "stealing the memories of families."[243]  It argued that the defendants were "bent on destroying the United States" and were "paid for by the American taxpayer."[244]  It contended that the defense argument that the agents were in the United States to keep an eye on the Cuban exile groups was false because they were on United States military bases, spying on United States military, the FBI, and Congress.[245]

---

[239] Id. at 14475.

[240] Id. at 14532, 14481.

[241] Id. at 14480.

[242] Id. at 14495.

[243] Id. at 14480-81.

[244] Id. at 14482.

[245] Id. at 14483-85, 14488.

The government implied that the government of Cuba was not cooperating with the FBI.[246] It commented that Cuba "was not alone" in shooting down civilian aircraft as they "are friends with our enemies," including "the Chinese and the Russians," and compared the BTTR shootdown to the 1986 Libyan shootdown of a civilian aircraft.[247] It maintained that the government of Cuba did not care about the occupants of the planes, and shot down the planes even though they could have forced Basulto's plane to land.[248] It argued that Cuba was a "repressive regime [that] doesn't believe in any [human] rights."[249] It summarized that the defendants had joined an "intelligence bureau . . . that sees the United States of America as its prime and main enemy" and that the jury was "not operating under the rule of Cuba, thank God."[250]

Campa and Hernandez's objections throughout the closing arguments were sustained.[251] The jury was subsequently instructed to consider only the evidence admitted during the trial, and to remember that the lawyers' comments were not

---

[246] Id. at 14493.

[247] Id. at 14512-13.

[248] Id. at 14513.

[249] Id. at 14519.

[250] Id. at 14475.

[251] Id. at 14482, 14483, 14493.

evidence.[252]

## H. Jury Conduct and Concerns During the Trial

Five months into the trial, when one seated juror had a conflict, the court discussed the possibility of removing a juror who had a two-day conflict and seating one of the alternates.[253] Hernandez's attorney requested a recess, arguing that the parties and the court had worked very hard to select "a jury we are very happy with" and, with Gonzalez, Guerrero, and Medina's attorneys, maintained that it would be unreasonable to refuse to accommodate the juror after her length of service and her request to complete the trial.[254] The district court granted the recess.[255]

In early February 2001, a small protest related to the trial was held outside of the courthouse, but the jury was protected from contact with the protestors and from exposure to the demonstration.[256] On 13 March 2001, the court noted that the day before, cameras were focused on the jurors as they left the building.[257] Despite

---

[252] R125 at 14583.

[253] R104 at 12091-92.

[254] Id. at 12091-94.

[255] Id. at 12094-95.

[256] R59 at 6096-108, 6145-49. The 20 protestors carried signs stating "take Castro down," "[f]air trial wanted," and "spies to be killed." Id. at 6145.

[257] R81 at 9005.

the court's arrangements to prevent exposure to the media, jurors were again filmed entering and leaving the courthouse during the deliberations and that footage was televised.[258] Some of the jurors indicated that they felt pressured; therefore, the district court again modified the jurors' entry and their exit from the courthouse and transportation.[259]

For deliberations, the jury was moved to another floor of the courthouse with controlled access.[260] During the deliberations, members of the jury were filmed entering and leaving the courthouse, and the media requested the names of the jurors.[261] The jurors expressed concern that they were filmed "all the way to their cars and [that] their license plates had been filmed."[262] To protect the jurors' privacy, the district court arranged for the jurors to come into the courthouse by private entrance and provided them with transportation to their vehicles or to mass transit.[263] The jury spent five days in deliberations and, during that period of time,

---

[258] R126 at 14644-47.

[259] Id. at 14645-47.

[260] R124 at 14546-47; R125 at 14624.

[261] R126 at 14643-46.

[262] Id. at 14644-45.

[263] Id. at 14645-47.

asked for and was given a comprehensive list of all of the admitted evidence.[264]

## I. **Motions for New Trial**

In late July and early August 2001, following the trial, Campa, Gonzalez, Guerrero, and Medina moved for a new trial and renewed their motions for a change of venue, arguing that their fears of presumed prejudice remained despite the district court's efforts during voir dire.[265]  Campa asserted that the jury's failure to ask questions and its quick verdicts in the complex, almost seven-month trial suggested that it was subject to community pressure and prejudice.[266]  Campa and Gonzalez also maintained that the jury was unduly prejudiced by the remarks of witness Jose Basulto.  According to Campa and Gonzalez, Basulto's testimony implied that Hernandez's counsel was "either a spy, a representative of the Cuban Government, a communist, or in the employ of the Cuban intelligence service."[267]  The district court denied the motions for new trial.  It referenced its prior orders denying a change of venue and denying reconsideration of the denial of the change of venue, and stated that because it was "[a]ware of the impassioned Cuban exile-community residing within this venue, the Court implemented a series of measures

---

[264]  R125 at 14625; R126 at 14640-43.

[265]  R12-1338 at 2-3; R12-1342 at 2-3; R12-1343 at 1-4; R12-1347 at 1-2.

[266]  R12-1343 at 1-3.

[267]  R12-1342 at 3; R12-1343 at 3-4.

to guarantee the Defendants' right to a fair trial."[268]  The court concluded that "any potential for prejudice was cured" "through the Court's methodical, active pursuit of a fair trial from voir dire . . . to . . . the return of verdict."[269]

In December 2001, Guerrero, Hernandez, and Medina were sentenced to life, Campa was sentenced to 228 months, and Gonzalez was sentenced to 15 years.[270]

In November 2002, Guerrero renewed his motion for a new trial based on newly discovered evidence; the motion was adopted by Campa, Gonzalez, Hernandez, and Medina.[271]  Guerrero argued that a new trial was warranted because of "misrepresentations of fact and law made by the United States Attorney in opposing the . . . motion for change of venue" and submitted an appendix to support his argument.[272]  He also argued that the government's position regarding

---

[268]  R13-1392 at 14.

[269]  Id. at 15.

[270]  R14-1430, 1435, 1437, 1439, 1445.

[271]  R15-1635, 1638, 1644, 1647, 1650, 1651.  The National Jury Project, the National Lawyers Guild, the International Association of Democratic Lawyers sought and were granted leave to file briefs as amicus curiae in support of this motion.  R15-1640, 1653, 1654, 1655, 1677.

[272]  R15-1635 at 1, 1636.  On appeal, Hernandez mentions that the government also made other misrepresentations related to this case in a petition for writ of prohibition and motion to stay in another case filed in this court, In re United States of America, No. 01-12887 (11th Cir. 2001) regarding the district court's rulings in this case.  The district judge commented on both statements made by the government and alleged by Hernandez to be mispresentations, calling one "an outright misrepresentation of fact" and another an "erroneous statement" and "gross misrepresentation[]."  R121 at 13918, 14025.

change of venue was contradicted by its position in a motion for change of venue which the government filed in <u>Ramirez v. Ashcroft</u>, No. 01-4835-Civ-Huck (S.D. Fla.) on 25 June 2002.

In <u>Ramirez</u>, the plaintiff, a Hispanic employed by the INS, alleged a hostile work environment, unlawful retaliation, and intimidation from his non-Hispanic fellow employees' hostility resulting from the INS's 22 April 2000 removal of Elian Gonzalez from the United States and his return to his father in Cuba.[273] Within the <u>Ramirez</u> motion for change of venue, the government noted that

> [T]he Elian Gonzalez matter was an incident which highly aroused the passions of the community and resulted in numerous demonstrations . . . .
>
>     5.  While the Elian Gonzalez affair has received national attention[,] the exposure in Miami-Dade County has been continuous and pervasive.  Indeed, even now, more than a year after the return of Elian to his father [in April 2000], there continues to be extensive publicity . . . which will arouse and inflame the passions of the Miami-Dade community.
>
> . . .
>
>     8.  Historically, media articles relating to Elian Gonzalez and the handling of his return to his father have persisted from November 1999 to the present [June 2002].[274]

The government argued that

> [i]t cannot be disputed that the return of Elian Gonzalez to his father in Cuba created a serious rift in this community, a rift which continues to

---

[273]  R15-1636, Ex. 2 at 1-2.

[274]  <u>Id.</u> 2-3, 11.

the present. This rift exists not only between Hispanics and non-Hispanics, but also between Cubans a[n]d non-Cubans and within the Cuban community itself. It is beyond dispute that virtually every person in Miami-Dade county [sic] has a strong opinion, one way or another, regarding the INS and the U.S. Attorney General's Office, and the manner in which the Elian Gonzalez matter was handled. The effect of the media coverage . . . serves to foment and revive these feelings on an ongoing basis. . . . As such the media accounts cannot do anything other than create the general state of mind where the inhabitants of Miami-Dade County are so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the instant case solely on the evidence presented in the courtroom. . . . Under such circumstances and strongly held emotions, and in light of the media coverage . . . , it will be virtually impossible to ensure that the defendants will receive a fair trial if the trial is held in Miami-Dade County.[275]

The government requested "a change in the location/venue" "outside of Miami Dade County to ensure that the Defendant . . . receive a fair and impartial trial on the merits of the case."[276] They noted that, "[w]hile not requested," the court also had the discretion to transfer the trial to another judicial district.[277] The government orally argued that there were no incidents "since 1985 that so polarized the community. That so affected every individual in the community as the Elian Gonzalez affair."[278] When the district court asked whether a transfer of the case to

---

[275] Id. at 14-15.

[276] Id. at 17, 16.

[277] Id. at 16 n.1.

[278] R15-1636, Ex. 3 at 24.

the Fort Lauderdale division courthouse would be sufficient, the government responded that "[t]he demonstrations occurred in Miami. They are predominantly conducted by citizens of Miami Dade county [sic]. As you move the case out of Miami Dade you have less likelihood there are going to be deep-seated feelings and deep-seated prejudices in the case."[279]

The appendix filed in support of the motion for new trial included an affidavit by Professor Moran, news articles, and reports by Human Rights Watch regarding threats to the freedom of expression within the Miami Cuban exile community.[280] Moran stated that he had previously had contact with the district judge in an earlier, unrelated litigation in which she had "excoriated" him for interviewing jurors after a trial and threatened the attorneys who had retained him.[281] Guerrero included a letter from Moran to the district court in which he offered "assist[ance]" to the district court "regarding (change of venue) surveys."[282] In Moran's affidavit, he explained that he did not provide a copy of his letter to the district judge to Guerrero's counsel because he was upset that he was not timely

---

[279] Id. at 25.

[280] R15-1636, Exs. 7-10, 12.

[281] R15-1636, Ex. 7 at 7.

[282] R15-1636, Ex. 1 at 1.

paid for his work by the district court.[283]  The news articles addressed the numerous

incidents of violence and threats by anti-Cubans in the decade preceding the trial.[284]

The Human Rights Watch reports covered harassment and intimidation suffered by

Miami Cuban exiles in expressing moderate political views as to Cuban relations or

Fidel Castro's government.[285]  The motion for new trial was also supported by a

public opinion survey conducted by legal psychologist Dr. Kendra Brennan and a

---

[283]  R15-1636 at 4-7.

[284] Jim Mullin, Frank Talk About Free Speech, MIAMI NEW TIMES, May 25, 2000, R15-1636, Ex. 9 ("The reason that the issues related to Cuba are the hot-button issues . . . is that we can't escape the fact that in this town there are 700,000 Cuban Americans.  There are 10,000 people in this town who had a relative murdered by Fidel Castro.  There are 50,000 people in this town who've had a relative tortured by Fidel Castro.  There are thousands of former political prisoners in this town.  For these people and for the 500,000 Cuban Americans who are old enough to remember having to leave their homeland, the issues related to Fidel Castro are not a historical note; they are living, breathing wounds."); Jim Mullin, The Burden of a Violent History, MIAMI NEW TIMES, Apr. 20, 2000, R15-1636, Ex. 10 ("Lawless violence and intimidation have been hallmarks of el exilio for more than 30 years.  Given that fact, it's not only understandable many people would be deeply worried, it's prudent to be worried.").
       We also take judicial notice of an editorial:  Luis Botifol, The Cuban Spies' Case vs. Credibility of the U.S. Judiciary, MIAMI HERALD, May 16, 2001 at 9B ("[T]he media's reports generate unfavorable comments in the [Cuban exile] community, which attributes the judge's permissiveness as stemming from an association with prominent members of the past administration who don't sympathize with the exile community. . . . [T]he defense surely has received ample cooperation from the Castro regime. . . . [T]he judge has permitted the defense a broad investigation . . . [T]rials like this one diminish the trust and credibility of the judiciary upon which our democracy rests.").  Hernandez's Br., App. F.

[285] Americas Watch/The Fund for Free Expression/Divisions of Human Rights Watch, Dangerous Dialogue/Attacks on Freedom of Expression in Miami's Cuban Exile Community, Aug. 1992, R15-1636, Ex. 12 ("Miami's Cuban exile community . . . has long been dominated by fiercely anti-Communist forces who are strongly opposed to contrary viewpoints, even if–especially if–expressed simply in terms of the desirability of a dialogue with, or opening to, the Castro regime."); Human Rights Watch/Americas Human Rights Watch Free Expression Project, United States Dangerous Dialogue/Threats to Freedom of Expression Continue in Miami's Cuban Exile Community, Nov. 1994, R15-1636, Ex. 8.

study by Florida International University's Professor of Sociology and Director of the Cuban Research Institute Dr. Lisandro Pérez.[286]  By affidavit, Dr. Brennan characterized the results of a poll of Miami Cuban-Americans as reflecting "an attitude of a state of war . . . against Cuba."[287]  She reviewed Moran's survey and stated that it "accurately reflects profound existing bias against those associated with the Cuban government in Miami[-]Dade County" where "[p]otential jurors . . . would be impervious to traditional methods of detecting and curing bias through voir dire and court instruction."[288]  Brennan determined that, although 49.7 percent of the local Cuban population strongly favored direct United States military action to overthrow the Castro regime, only 26 percent of the local non-Cuban population and 8.1 percent of the national population favored such action.[289]  Similarly, 55.8 percent of the local Cuban population strongly favored military action by the exile community to overthrow the Cuban government but only 27.6 percent of the local non-Cuban population and 5.8 percent of the national population favored such action.[290]  She concluded that there was "an attitude of a state of war between the

---

[286]  R15-1636, Exs. 4, 5.

[287]  R15-1636, Ex. 4 at 1, 3.

[288]  Id. at 8.

[289]  Id. at 3.

[290]  Id.

local Cuban community against Cuba" which had "spilled over to the rest of the community" and had a "substantial impact on the rest of the Miami-Dade community."[291] She found that the documented community bias showed a "deeply entrenched body of opinions [so entrenched as to often not be consciously held] that would hinder any jury in Miami-Dade County from reaching a fair and impartial decision in this case."[292]

Dr. Pérez concluded that "the possibility of selecting twelve citizens of Miami-Dade County who can be impartial in a case involving acknowledged agents of the Cuban government is virtually zero . . . even if the jury were composed entirely of non-Cubans, as it was in this case."[293] His conclusion was based on a number of factors, including the demographics of the area and the cohesiveness, political impact, interests, and emotional concerns of the Cuban community. Specifically, he noted that "persons of Cuban birth or descent represent the largest single racial/ethnic/national origin group in the venue group in Miami-Dade County, comprising two out every seven residents."[294] He explained that the Cubans created a "true ethnic enclave" which exercised strong economic

---

[291] Id.

[292] Id. at 7.

[293] R15-1636, Ex. 5 at 2-3.

[294] Id. at 3-4.

74

and political influence within the Miami-Dade County community as evidenced by the establishment of major institutions such as the Cuban American National Foundation, the Hispanic Builders Association, the Latin Chamber of Commerce, and the Latin Builders Association and the election of numerous Cuban-American public officials including the Miami mayor, city and county managers, city commissioners, state legislators, members of the United States Congress, mayors and city commissioners and councilpersons in other local cities and towns, and leaders at local universities.[295] The Cuban community's "most overriding concern: the ongoing struggle for the recovery of their homeland" had been "injected" into the Miami-Dade County community to the extent that it took "center stage."[296] Pérez stated that the issue was characterized by an "uncompromising hostility towards the Cuban government" and included an intolerance toward opposing views which brought economic, political, social pressure on the dissenting individual or group.[297] He reported that "[t]here was a long history of threats, bomb scares, actual bombings, and even murders directed at" individuals and groups perceived to have a "softness" toward Castro's regime.[298] He also noted that, while

---

[295] Id. at 6-7.

[296] Id. at 7.

[297] Id. at 8.

[298] Id. at 8-9.

many Cubans and non-Cubans had expressed dissenting views on the fate of Elian Gonzalez and on the United States policy toward Cuba, the defendants' case concerned "[t]he 1996 shootdown [which] was uniformly repudiated in Miami" and thus approached a "taboo, a position that no one would want to take, or even appear to take."[299]

The district court denied the motion, stating that "the situation in Ramirez differed from the facts of this case in numerous ways" because it "related directly to the INS's handling of the removal of Elian Gonzalez from his uncle's home, an event which, it is arguable, garnered more attention here in Miami and worldwide."[300] Also, the district court noted that the government's position in Ramirez "was premised specifically upon the facts of that case, including that the plaintiff had . . . stirred up extensive publicity in the local media focusing directly on the facts he alleged in the lawsuit."[301] It concluded that the government's arguments "in Ramirez do not in any way demonstrate prosecutorial misconduct in the instant case."[302] The district court did not consider the "interests of justice" issue and thus declined to consider any of the exhibits submitted in support of this

---

[299] Id. at 12-13.

[300] R15-1678 at 8-9.

[301] Id. at 9.

[302] Id.

argument, including Dr. Brennan's survey and conclusions and Dr. Pérez's study.[303]

## II. DISCUSSION

On appeal, Campa, Gonzalez, Guerrero, Hernandez, and Medina argue that the district court's denial of their motions for change of venue violated Federal Rule of Criminal Procedure 21(a), denied them a fair trial, and undermined the reliability of the verdicts.[304] They contend that the district court ignored the unique confluence of demographics, politics, and culture in the Miami community, the strong anti-Castro sentiment in that community, and the history of violence within the Cuban-exile community. They maintain that a new trial was warranted because of the government's use of inflammatory statements during closing arguments.[305] Campa, Gonzalez, Guerrero, Hernandez, and Medina contend that the district court abused its discretion in denying the motion for new trial and change of venue because it failed to properly consider the newly discovered evidence which supported the argument that the defendants were unable to receive

---

[303] Id. at 6 n.3.

[304] The change of venue issue was briefed by Guerrero and Campa, and adopted by Gonzalez, Hernandez, and Medina. Campa also adopted the argument presented by Guerrero, while Guerrero adopted the argument presented by Campa on this issue.

[305] The issue addressing prosecutorial misconduct during closing arguments was addressed by Hernandez and Campa, and adopted by Guerrero and Medina. Campa also adopted the arguments presented by Hernandez on this issue.

a fair trial before an impartial jury in Miami.[306]  They posit that the district court

abused its discretion by denying the requests for an evidentiary hearing to present

additional evidence regarding irregularities with expert witness Moran.

A. **Denial of Motion for Change of Venue**

We conduct a multi-level review on the denial of a motion for change of

venue.  We review the district court's interpretation of the Federal Rules of

Criminal Procedure de novo, see United States v. Noel, 231 F.3d 833, 836 (11th

Cir. 2000) (per curiam), and application of Rule 21(a) for abuse of discretion, see

United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975).[307]  However,

"[w]hen a criminal defendant alleges that pretrial publicity precluded a trial

consistent with the standards of due process," we are bound to "undertake an

independent evaluation of the facts established in support of such an allegation."

Id.

"A fair trial in a fair tribunal is a basic requirement of due process,"

requiring not only "an absence of actual bias," but also an effort to "prevent even

the probability of unfairness."  In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623,

---

[306] The National Lawyers Guild also filed an amicus curiae brief on the motion for new trial based on newly discovered evidence.

[307] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to 1 October 1981.

625 (1955); see also Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S. Ct. 1507, 1522 (1966) ("Due process requires that the accused receive a fair trial by an impartial jury free from outside influences."). A juror's verdict "must be based upon the evidence developed at the trial" "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." Irwin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961).

A federal criminal defendant's motion for change of venue based on prejudice is governed by Federal Rule of Criminal Procedure 21. Upon such a motion,

> the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a).[308] Our review of the denial of a change of venue motion is guided by a due process analysis. See United States v. Fuentes-Coba, 738 F.2d

---

[308] The 1966 Amendments eliminated earlier versions of Rule 21 which referenced transfers to "divisions" and clarified that "[t]transfers within the district to avoid prejudice will be within the power of the judge to fix the place of trial" under Rule 18. See Fed. R. Crim. P. 21 advisory committee's note. Under Rule 18, "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18. The 1966 Amendments vested the district court with "discretion . . . to fix the place of trial at any place within the district. . . . If the court is satisfied that there exists in the place fixed for trial prejudice against the defendant so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where prejudice does not exist." Fed. R. Crim. P. 18 advisory committee's note.

At the change of venue motion hearing, the defendants agreed that a transfer to the Fort Lauderdale division office would be acceptable.

1191, 1194 (11ᵗʰ Cir. 1984).

When the jurors are to be drawn from a community which is "already permeated with hostility toward a defendant," whether that hostility is a result of prejudicial publicity or other reasons, the court should examine the various methods available to assure an impartial jury. Groppi v. Wisconsin, 400 U.S. 505, 509-10, 91 S. Ct. 490, 493 (1971). Those methods include granting a continuance to allow "the fires of prejudice [to] cool," the exercise of peremptory and for cause challenges to the venire to exclude jurors who exhibit the prejudices of their communities, and granting a change of venue when the community has been repeatedly and deeply exposed to prejudicial publicity. See id. at 510, 91 S. Ct. at 493.

While a change of venue or a continuance should be granted when prejudicial pretrial publicity threatens to prevent a fair trial, a new trial should be ordered if publicity during the proceedings threatens the fairness of the trial. See Sheppard, 384 U.S. at 363, 86 S. Ct. at 1522. A fair trial is denied when a court refuses to grant a request for change of venue despite pretrial publicity and pervasive community exposure to the crime causes a trial to be a "hollow formality." Rideau v. Louisiana, 373 U.S. 723, 726, 83 S. Ct. 1417, 1419 (1963). To ensure that a defendant will "be tried in an atmosphere undisturbed by . . . a

wave of public passion," Irvin, 366 U.S. at 728, 81 S. Ct. at 1645, a court is required, upon a criminal defendant's motion, to transfer the proceedings "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial." Fed. R. Crim. P. 21(a). It is unnecessary to determine whether prejudice is disclosed during voir dire if the evidence reflects a "generally hostile atmosphere of the community" which causes the jurors to "inherently suspect circumstances of . . . prejudice against a particular defendant." Pamplin v. Mason, 364 F.2d 1, 6, 7 (5th Cir. 1966). Further, where community hostility is prevalent, "[i]t is unnecessary to prove that local prejudice actually entered the jury box." Id. at 6. If community sentiment is strong, courts should place "emphasis on the feeling in the community rather than the transcript of voir dire" which may not "reveal the shades of prejudice that may influence a verdict." Id. at 7; see also Williams, 523 F.2d at 1209 n.10 (stating that although voir dire examination results "are an important factor in gauging the depth of community prejudice, continual protestations of impartiality . . . are best met with a healthy skepticism from the bench").

In Irwin, the Supreme Court held that a defendant was entitled to a change of venue even though each individual juror had specifically claimed the capacity

81

to be fair and impartial.  It noted:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father.  Where so many, so many times, admitted prejudice, such as statement of impartiality can be given little weight.

Irwin, 366 U.S. at 728, 81 S. Ct. at 1645.  "Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial."  Pamplin, 364 F.2d at 5.  Mindful that the first and best judge of community sentiment and juror indifference is the trial judge, an appellate court should "interfere only upon a showing of manifest probability of prejudice."  Bishop v. Wainwright, 511 F.2d 664, 666 (5th Cir. 1975).

Presumed prejudice has been found "where prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial by an impartial jury . . . and the press saturated the community with . . . accounts of the crime and court proceedings."  United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979).  Factors to be considered in determining prejudice include the extent of the dissemination of the publicity, the character of that publicity, the proximity of the publicity to the trial, and the familiarity of the jury

82

with the charged crime.[309]  See Williams, 523 F.2d at 1209-10.  Presumed

prejudice may be rebutted where the jury is shown to be capable of sitting

impartially.  See Knight v. Dugger, 863 F.2d 705, 707, 723 (11th Cir. 1988);

Coleman v. Kemp, 778 F.2d 1487, 1542 n.25 (11th Cir. 1985);.

If a movant "adduces evidence of inflammatory, prejudicial pretrial

publicity that so pervades or saturates the community as to render virtually

impossible a fair trial by an impartial jury drawn from that community, jury

prejudice is presumed and there is no further duty to establish bias."  Mayola v.

Alabama, 623 F.2d 992, 997 (5th Cir. 1980) (citation and internal quotations

omitted).  Although such presumed prejudice is only rarely applied, the successful

movant need not show that the jury was actually prejudiced by the pervasive

community sentiment or that the jurors were actually exposed to any publicity, but

must show that, first, "the pretrial publicity was sufficiently prejudicial and

inflammatory and second that the prejudicial pretrial publicity saturated the

community where the trial was held."  Spivey v. Head, 207 F.3d 1263, 1270 (11th

---

[309] We also note that the American Bar Association recommends that a court's determination of a change of venue motion based on "dissemination of potentially prejudicial material" be based on "such evidence as qualified public opinion surveys or opinion testimony by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved."  ABA Standards for Criminal Justice: Fair Trial and Free Press, 8-3.3(b) (1992).  Where there is a substantial likelihood of prejudice from such publicity, Standard 8-3.3 also instructs:  (1) that "[a] showing of actual prejudice" is not required; (2) the selection of an acceptable jury is not controlling; and (3) "the failure to exercise all available peremptory challenges" is not a waiver.  Id. at 8-3.3(b), (c), and (d).

Cir. 2000); Mayola, 633 F.2d at 997. The movant bears the extremely heavy burden of proving that the pretrial publicity deprived him of his right to a fair trial. See Coleman, 778 F.2d at 1489, 1537. Just as issues involving prejudice from publicity require a review of the "special facts" of each case, Marshall v. United States, 360 U.S. 310, 312, 79 S. Ct. 1171, 1173 (1959) (per curiam), a review of presumed prejudice requires a review of the totality of the circumstances. See Murphy v. Florida, 421 U.S. 794, 798-99, 95 S. Ct. 2031, 2035-36 (1975). Further, a court considering a change of venue motion must review all of the circumstances and events occurring before and during the trial and their cumulative effect. See Williams, 523 F.2d at 1206 n.7.

One of the matters to consider in reviewing the totality of the circumstances is an extensive voir dire. See Patton v. Yount, 467 U.S. 1025, 1029, 1034, 104 S. Ct. 2885, 2888, 2890 (1984); Jordan v. Lippman, 763 F.2d 1265, 1276 (11th Cir. 1985) (noting "the fundamental importance of voir dire as a tool for insuring the right to an impartial jury"). Presumed prejudice can be shown through admitted prejudice or the demeanor and credibility of the venire. See Patton, 467 U.S. at 1029, 1038, 104 S. Ct. at 2888, 2892.

Where, however, the court reviewed an extensive public opinion survey of potential jurors and a purported jury prejudice expert's analysis of media

84

coverage, where a thorough voir dire was conducted by the court and counsel, and where the jury panel was accepted by counsel without the renewal of a motion for change of venue, a defendant's rights were held to be sufficiently safeguarded. See Fuentes-Coba, 738 F.2d at 1194-95. Further, the presumption of prejudice was not found where, although "virtually every venireperson and actual juror had heard or read accounts of the case," only a few of the venirepersons indicated a preconceived opinion about the defendant's guilt or innocence, the venirepersons with preconceived opinions who did not believe that they could set their opinions aside were excused for cause, and the extensive publicity was neither inflammatory nor pervasive. Ross v. Hopper, 716 F.2d 1528, 1541 (11th Cir. 1983). If a party fails to demonstrate either actual or pervasive community prejudice, the absence of juror prejudice may also be indicated by the failure of a party to use all of its allotted peremptory challenges. See United States v. Alvarez, 755 F.2d 830, 859 (11th Cir. 1985); Dobbert v. Florida, 432 U.S. 282, 303-04, 97 S. Ct. 2290, 2303 (1977). Further, a lack of juror prejudice can be presumed when a defendant fails to challenge the district court's voir dire or move for a change of venue after the voir dire. See United States v. Yousef, 327 F.3d 56, 90 (2d Cir. 2003). In assessing a change of venue request based on pretrial publicity, the existence of overwhelming evidence of guilt is not dispositive. See Coleman, 778

F.2d at 1541.

Despite the district court's numerous efforts to ensure an impartial jury in this case, we find that empaneling such a jury in this community was an unreasonable probability because of pervasive community prejudice. The entire community is sensitive to and permeated by concerns for the Cuban exile population in Miami. Waves of public passion, as evidenced by the public opinion polls and multitudinous newspaper articles submitted with the motions for change of venue–some of which focused on the defendants in this case and the government for whom they worked, but others which focused on relationships between the United States and Cuba–flooded Miami both before and during this trial.[310] The trial required consideration of the BTTR shootdown and the martyrdom of those persons on the flights. During the trial, there were both "commemorative flights" and public ceremonies to mark the anniversary of the shootdown. Moreover, the Elian Gonzalez matter, which was ongoing at the time of the change of venue motion, concerned these relationships between the United States and Cuba and necessarily raised the community's awareness of the concerns of the Cuban exile community. It is uncontested that the publicity concerning Elian Gonzalez continued during the trial, "arousing and inflaming" passions

---

[310] Without determining the validity of Professor Moran's poll, we note that the district court approved the expenditures related to the poll, including the size of the statistical sample.

within the Miami-Dade community. Despite the district court's thorough and extensive voir dire and its many efforts aimed at protecting the jurors' privacy, voir dire highlighted the community's awareness of this case and also of that of Elian Gonzalez. In this instance, there was no reasonable means of assuring a fair trial by the use of a continuance or voir dire; thus, a change of venue was required. The evidence at trial validated the media's publicity regarding the "Spies Among Us" by disclosing the clandestine activities of not only the defendants, but also of the various Cuban exile groups and their paramilitary camps that continue to operate in the Miami area. The perception that these groups could harm jurors that rendered a verdict unfavorable to their views was palpable. Further, the government witness's reference to a defense counsel's allegiance with Castro and the government's arguments regarding the evils of Cuba and Cuba's threat to the sanctity of American life only served to add fuel to the inflamed community passions.

## B. **Denial of New Trial**

We review a district court's denial of a motion for new trial for abuse of discretion. See United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998). A district court is authorized to grant a new trial "if the interests of justice so require" in extraordinary circumstances and, if the motion is based on newly

discovered evidence, if a motion for new trial is filed within three years of the verdict.  See Fed. R. Crim. P. 33(a) and (b)(1) (2002).[311]  Newly discovered evidence must satisfy a five-part test:  (1) the evidence was newly discovered after the trial; (2) the movant shows due diligence in discovering the evidence; (3) the evidence is not  merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial would reasonably produce a new result.  See United States v. DiBernardo, 880 F.2d 1216, 1224 (11th Cir. 1989).  The newly discovered evidence is not limited to just the question of the defendant's innocence, but can include other issues of law, See United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978) (per curiam), including questions of the fairness of the trial.  See United States v. Williams, 613 F.2d 573, 575 (5th Cir. 1980).  Consideration of a motion for new trial based on newly discovered evidence can also include a review of evidence obtained post-trial.  See United States v. Devila, 216 F.3d 1009, 1013, 1017 (11th Cir. 2000) (per curiam), vacated in part on other grounds, 242 F.3d 995, 996 (2001).

The grant of a new trial may be based on pretrial publicity, a prosecutor's improper closing argument, and the combined effect of publicity and prosecutorial

---

[311]  Rule 33 was "stylistically" amended in 2002 "to make [it] more easily understood and to make style and terminology consistent throughout the rules."  See Fed. R. Crim. P. 33 advisory committee's note (2002).  The earlier revision was not subdivided, but the relevant wording remained the same.

zeal.  Thus, we  thus "widen the breadth of our consideration" to determine whether "these two factors operating together deprived the [defendant] of a fair trial."  Williams, 523 F.2d at 1204-05, 1209; see also Jordan v. Lippman, 763 F.2d 1265, 1266, 1267, 1269, 1279 (11th Cir. 1985) (finding that, in a state habeas corpus proceeding, a new trial based on a change of venue was required when "extensive publicity" was coupled with the community's "long history of racial turbulence" and the involved institution's "economic and social impact" on community).

Attorneys representing the United States are burdened both with an obligation to zealously represent the government and, as a "representative of a government dedicated to fairness and equal justice to all," an "overriding obligation of fairness" to defendants.  United States v. Wilson, 149 F.3d 1298, 1303 (11th Cir. 1998).  A prosecutor may not make improper assertions, insinuations, or suggestions that could inflame the jury's prejudices or passions. United States v. Rodriquez, 765 F.2d 1546, 1560 (11th Cir. 1985).   Such an obligation includes a "duty to refrain from improper methods calculated to produce a wrongful conviction."  United States v. Crutchfield, 26 F.3d 1098, 1103 (11th Cir. 1994) (internal citation omitted).  A trial may be rendered fundamentally unfair by the prosecution's use of factually contradictory theories.  See Smith v.

<u>Groose</u>, 205 F.3d 1045, 1051-52 (8th Cir. 2000) (holding that the prosecution's use of contradictory theories for different defendants in a murder trial violated due process).[312]  A prosecutor's reliance on a legal position despite "knowing full well" that it is wrong is "reprehensible" in light of his duty "by virtue of his oath of office."  <u>United States v. Masters</u>, 118 F.3d 1524, 1525 & n.4  (11th Cir. 1997) (per curiam).  Further, when the government has sought to foreclose the submission of evidence, an evidentiary hearing is warranted on a motion for new trial when the newly-discovered evidence "might likely lead" to a new trial.  <u>United States v. Espinosa-Hernandez</u>, 918 F.2d 911, 914 (11th Cir. 1990) (per curiam).

We also note that the rule against the use of evidence of other crimes or bad acts by a defendant is intended to prevent a conviction based on the theory of "Give a dog an ill name and hang him."  <u>United States v. Boyd</u>, 446 F.2d 1267,

---

[312]  We note that judicial equitable estoppel generally bars a party from asserting a position in a legal proceeding that is inconsistent with its position in a previous, <u>related</u> proceeding.  <u>See</u> <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001).  As discussed earlier, one of the arguments Guerrero made in his motion for a new trial (which was adopted by Campa, Gonzalez, Hernandez and Medina) was that the government contradicted its position on change of venue in this case with the position that it took regarding the motion for change of venue that it filed in the <u>Ramirez</u> case.  <u>See</u> <u>supra</u> at __.  But, judicial equitable estoppel is not applicable here because <u>Ramirez</u>, a civil case, was unrelated to this criminal prosecution.  However, because the doctrine seeks to prevent a "party from 'playing fast and loose'" with the courts, the guidance that it provides may be helpful to parties considering a change in their subsequent position in unrelated litigation based upon the same set of facts.  <u>See</u> 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice and Procedure</u> § 4477 (2d ed. 2002).

1273 (5th Cir. 1971) (citation and internal punctuation omitted).  The interest of the United States Attorney, as representative

> of a sovereignty whose obligation is to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .  He may prosecute with earnestness and vigor–indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).  Because "the average jury . . . has confidence that these obligations will be faithfully observed, . . . improper suggestions [and] insinuations . . . are apt to carry much weight against the accused when they should properly carry none."  Id. at 88, 55 S. Ct. at 633.  "Where such conduct was pronounced and persistent, with a probable cumulative effect upon the jury which can not be disregarded as inconsequential[,] [a] new trial must be awarded."  Id. at 89, 55 S. Ct. at 633.

Here, a new trial was mandated by the perfect storm created when the surge of pervasive community sentiment, and extensive publicity both before and during the trial, merged with the improper prosecutorial references.  The district court's instructions to the jury only generally reminded the jury that statements by the attorneys were not evidence to be considered.  The community's displeasure with the Elian Gonzalez controversy paled in comparison with its revulsion toward the

91

BTTR shootdown. In a civil case which arose out of the same facts as this criminal prosecution, the BTTR shootdown was described as an "outrageous contempt for international law and basic human rights" perpetrated by the Cuban government in murdering "four human beings" who were "Brothers to the Rescue pilots, flying two civilian, unarmed planes on a routine humanitarian mission, searching for rafters in the waters between Cuba and the Florida Keys." Alejandre, 996 F. Supp. at 1242. In Ramirez, the government not only recognized the effect of the Elian Gonzalez matter on the community, but also that the publicity continued through 2002. See supra at __. If the effect of those inflamed passions is clear in an employment discrimination action against the agency which contributed to Elian Gonzalez's removal and which failed to support the Cuban exiles' position, it is manifest in a criminal case against admitted Cuban spies who were alleged to have contributed to the murder of "humanitarians" working to rescue rafters such as Elian Gonzalez.

### III. CONCLUSION

In light of the foregoing discussion, the defendants' convictions are REVERSED and we REMAND for a new trial.

The court is aware that, for many of the same reasons discussed above, the reversal of these convictions will be unpopular and even offensive to many

citizens. However, the court is equally mindful that those same citizens cherish and support the freedoms they enjoy in this country that are unavailable to residents of Cuba. One of our most sacred freedoms is the right to be tried fairly in a noncoercive atmosphere. The court is cognizant that its judgment today will be received by those citizens with grave disappointment, but is equally confident of our shared commitment to scrupulously protect our freedoms. The Cuban-American community is a bastion of the traditional values that make America great. Included in those values are the rights of the accused criminal that insure a fair trial. Thus, in the final analysis, we trust that any disappointment with our judgment in this case will be tempered and balanced by the recognition that we are a nation of laws in which every defendant, no matter how unpopular, must be treated fairly. Our Constitution requires no less.